**Darrel STEELE, Appellant,**

v.

**JOB SERVICE NORTH DAKOTA and Stutsman County, Appellees.**

**Civ. No. 880376.**

Supreme Court of North Dakota.

Aug. 15, 1989.

---

11. Hersch's attorney on this appeal did not represent Hersch at trial.

Joseph F. Larson, II (argued), Jamestown, for appellant.

David E. Clinton (argued), Asst. Atty. Gen., Bismarck, for appellee, Job Service North Dakota.

Wendy P. Schulz, States Atty., Jamestown, for appellee, Stutsman County. No brief or appearance.

ERICKSTAD, Chief Justice.

Darrel Steele appeals from the judgment of the district court affirming the decision of Job Service North Dakota, denying Steele unemployment benefits because he was discharged from his previous employment for reasons constituting misconduct under section 52–06–02(2), N.D.C.C.[1] We reverse.

---

1. Section 52–06–02(2), N.D.C.C. provides:

*"Disqualification for benefits.* An individual shall be disqualified for benefits: ˙

"2. For the week in which he has been discharged for misconduct in connection with his most recent employment and thereafter until such time as he:

"a. Can demonstrate that he has earned remuneration for personal services in employment equivalent to at least ten times his weekly benefit amount as determined under section 52–06–04; and

"b. Has not left his most recent employment under disqualifying circumstances.

"For the purpose of this subsection, 'most recent employment' means employment with any employer for whom the claimant last worked and was discharged for misconduct in connection with his employment or with any employer, in insured work, for whom the

Steele was a full-time employee at the Stutsman County Road Department for approximately eight years under the supervision of Oswald Schultz, the county highway superintendent. On May 7, 1987, Steele suffered a serious on-the-job injury to his left hand in which the distal portion of the thumb was amputated. On May 11, on his own initiative, Steele submitted to Schultz a medical certificate from his physician releasing him from work for thirty days.

Approximately two weeks after the accident, Schultz talked with Steele at the road department shop and inquired as to whether or not Steele could come back to light duty work. Steele replied that his finger was still too sore. In following weeks, Steele periodically stopped at the shop to deliver a workers compensation check to the bookkeeper and to pick up his paycheck. Although Schultz' duties kept him out of the office and on the road, Schultz was apparently aware of Steele's visits.

On June 10, Schultz stopped at Steele's home and asked if Steele could come to work and monitor the crusher, a light duty task. Steele showed Schultz his injured thumb, told him that he did not think he could do the work Schultz asked because the thumb was too sensitive, and explained he was going to be taking physical therapy. Schultz and Steele had no further direct contact, either in person or by telephone. On June 25, Steele went to the shop to pick up his payroll check, and, while there, told the bookkeeper that he would be taking physical therapy for two weeks and that his next doctor's appointment was on July 6.

On June 30, Schultz wrote Steele a letter stating:

"Dear Sir:

"In regard to your injury you have been off work 8 weeks including this week. It is time you came back to work. There has never been anyone off work this long before with the same injury.

claimant last worked and earned wages equal to or exceeding ten times his weekly benefit

"Since you have told the Doctor not to release any information to us about your injury or when you will be back to work you don't leave us any choice but to take action in this matter.

"By doing this you are keeping us in the dark and you can be subject to lay-off. If you do not come back to work by July 6, 1987 your pay will automatically stop. You were told Verbally that you should come back to work and to do light duty work watching crusher so if something went wrong with the crusher to pull clutches to stop feed into crusher or you can run loader.

"Workmens compensation will also discontinue payment if you want to withhold information from us."

Steele received this letter on July 2, a Thursday, and tried, unsuccessfully, to contact Schultz by telephone several times throughout the July 4th weekend. Schultz testified that he was out-of-town on a camping trip for the better part of the weekend.

On July 2, Steele wrote Schultz a letter responding to the June 30 letter. Steele told Schultz that he found the allegations very unfair and unreasonable. He asserted he had never informed his doctor to withhold information regarding the injury and told Schultz that he would be back to work when he was released by his doctor. Steele reminded Schultz that he had a doctor's appointment at 2:00 p.m. on July 6, at which time he expected to be told what duties, if any, he would be able to perform.

On Monday morning, July 6, Steele called Larry Olson, the county auditor, to make an appointment with the Stutsman County Commission. According to Steele, the reason he wanted the meeting was to "see the commissioners and get this matter resolved, see if they were going to stand behind what Ozzie had said to terminate me or—get him to reverse that decision so I could go back to work." The meeting was set for approximately 11:00 a.m. on July 7.

amount."

Steele went to his doctor's appointment in the afternoon of July 6. As a result of that appointment, Steele was released for light duty work.[2] Steele did not go out to the shop on July 6.

Both Schultz and Steele attended the July 7 commissioners' meeting. Schultz was sitting at a table facing the commissioners, with the rest of the audience behind him. Schultz and Steele did not speak directly to each other, but presented their respective positions to the commissioners. At noon, the commissioners broke for lunch and told the audience that they were going to get together with Schultz in the afternoon and then make a decision. Steele did not attend the afternoon meeting.

When the commissioners met in the afternoon on July 7, they reviewed the matter and told Schultz to proceed. Steele waited to hear from the commissioners, and when he was not contacted, had his wife call Olson on July 8 to find out what the commission had decided. Olson said that no decision was made and suggested that all Steele could do was talk to Schultz about it. Steele did not call Schultz and Schultz did not call Steele. On July 9, Schultz sent Steele a letter stating:

"Dear Sir:

"Since you were given the opportunity to come back to work on Monday July 6, 1987 and did not show up for work or contact me in any manner.

"You were given another chance when you came in to the Commissioners meeting you was ask to come to work or produce an excuse slip from your Doctor who you had seen on Monday July 6, 1987 you did not produce an excuse slip or come back to work or contact me since then. I am informing you that your job has been terminated as of July 6, 1987."

Steele applied for unemployment benefits on October 15, 1987. On November 3, a Job Service claims deputy determined that Steele was discharged for reasons which constitute misconduct and informed Steele that he was disqualified from unemployment benefits. Steele requested a hearing,

which was held, and on February 4, 1988, the appeals referee affirmed the deputy's determination. Steele appealed this decision to the district court which affirmed the Job Service decision in a memorandum decision dated September 14, 1988, and entered judgment October 12, 1988. Steele then brought this appeal.

In *Six v. Job Service North Dakota,* we recently reiterated the standard of review we apply to an administrative agency decision.

"Our review of administrative agency decisions is governed by section 28–32–19, N.D.C.C., and involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Falcon v. Williams Cty. Social Serv. Bd.,* 430 N.W.2d 569 (N.D.1988). When an administrative agency decision is appealed to the district court and then to this Court, we review the decision of the agency and not the decision of the district court. *Bohac v. Graham,* 424 N.W.2d 144 (N.D.1988). We review the record compiled before the agency rather than the findings of the district court. *Falcon v. Williams Cty. Social Serv. Bd., supra.* In determining whether or not the agency's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979)." *Six v. Job Service North Dakota,* 443 N.W.2d 911 (N.D. 1989).

The Job Service referee's decision stated in pertinent part:

"FINDINGS OF FACT:

"The claimant was a full-time employee for a county road department for approximately eight years. On May 7, 1987, he

---

**2.** Steele was released with no work restrictions on July 21, 1987.

was injured in an accident which occurred on the job. He was hospitalized for several days for surgery on his thumb. He presented a doctor's statement to his employer which indicated he would be off work for 30 days. At the end of 30 days, he had not returned to work and, in subsequent weeks, the supervisor had requested he return to light work which would require only that he monitor the operation of machinery and be available to pull a lever to stop the machinery if something went wrong. The claimant would not do so.

"On June 30, 1987, the superintendent sent the claimant a letter advising the claimant that he believed he should return to work and that the employer had received no additional medical evidence concerning his condition. This letter informed the claimant that if he did not return to work by July 6, 1987, his pay would stop.

"The claimant responded with a letter to the employer on July 2, 1987. The claimant also had a conversation with the county auditor who advised him that all he had to do was bring in medical evidence that he was unable to work and the matter would be resolved. The claimant requested a hearing before the county commissioners. On July 7, the claimant and his superintendent appeared before the county commissioners. The claimant had been to the doctor on July 6, and the doctor had released him to do light work such as the superintendent requested he do, but the claimant did not obtain a statement from the doctor nor present any medical evidence to the superintendent or the county commissioners at that meeting. The county commissioners upheld the action of the superintendent.

"On July 9, 1987, the superintendent sent a letter to the claimant advising him that because he had not returned to work nor presented evidence that he was unable to return to work, he was being terminated from employment as of July 6, 1987. "REASON FOR THE DECISION:

"*Testimony establishes that the employer did not discharge the claimant be-cause he was unable to work, but rather because he would not provide evidence that he was unable to work or, return to work, if he was able to work. The employer's request that the claimant provide evidence that he was unable to work is a reasonable request.* The claimant was examined by his doctor on July 6 and advised he could return to light work, yet he did not obtain a statement from the doctor to present to his employer and the commissioners before whom he had scheduled a hearing even though he was aware that failure to present evidence of inability to work or to return to work would result in the loss of his employment." [Emphasis added.]

"The law provides that if a worker is discharged for misconduct in connection with his work, he would not be entitled to job insurance benefits.

"*Misconduct* has been defined as conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent, or evil design, or to show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to his employer." [Emphasis in original.]

"It is reasonable for an employer to request that an employee who is able to work should report to work and that an employee who is not able to work provide medical evidence that he is not able to work. *The claimant had ample opportunity and knowledge beforehand that his failure to comply with his employer's requests would result in his discharge. Therefore, by failing to substantiate the reasons for his absence, the claimant has disregarded the employer's interests as well as his responsibilities toward the employer. He has refused to comply with a reasonable demand. I conclude that he has been discharged for reasons constituting*

*misconduct* within the meaning of the law as stated above. Therefore, he is not entitled to job insurance benefits." [Emphasis added.]

Prior to the accident, Steele's employment record was unmarred. Schultz himself stated that Steele was a hard worker and had a good work ethic. The discharge was based solely on the events following the accident.

The procedure to be followed in matters of sick or injury leave is set forth in the Stutsman County Employees Guide, Section IV. Schultz did not discuss this procedure with Steele because he explained that "they all have the policy and procedure, they know what the, I mean if they read it they should know what the proc-procedures are." Subsection E provides: "The department head *may* require the employee to secure a medical certificate from an attending physician if said employee is absent from work more than three consecutive days." [Emphasis added.][3]

■ On May 11, four days after the accident, on his own initiative, Steele provided the initial medical certificate releasing him from work for 30 days. It was not unreasonable, under the procedure set forth by the county, for Steele to assume that if Schultz wanted an additional excuse, he would ask for one. In a hearing held by the Workers Compensation Bureau on this same incident, and again in a hearing held by Job Service, Schultz testified several times that he never asked Steele for an additional medical certificate.

While Schultz did not ask Steele for an additional medical excuse, he did call the clinic and asked the nurse for information concerning Steele's progress. The nurse refused to answer Schultz' questions, explaining that she could not release information about Steele's condition without Steele's approval because it was confidential. The nurse testified that Schultz did not seem to understand this.

Schultz also testified that, when the nurse would not release information, he thought it was because Steele had told the clinic personnel not to. Furthermore, when Schultz wrote the June 30 letter to Steele, he was under the mistaken impression that Steele had told his doctor not to release information to his employer. Steele first learned that Schultz had called the clinic when speaking with his physician during the July 6 appointment.

Although Schultz did not directly request an additional medical excuse from Steele, Job Service asserts that Steele understood the letter of June 30 to be such a request. Steele does not agree with this assertion and contends that, in fact, he read the June 30 letter to be a termination letter. The entire letter is set forth earlier in this opinion and does not appear to provide a sound basis for either interpretation. In essence, the letter tells Steele that "[i]f you do not come back to work by July 6, 1987 your pay will automatically stop."[4]

On July 2, when the June 30 letter was received, Steele had not been released for work by his doctor. Instead of showing up for work Monday as Schultz demanded, Steele reacted by writing Schultz a letter and setting up a meeting with the county commissioners.

Job Service asserts that, in addition to the June 30 letter, Steele was told by Olson, the county auditor, to bring in a medical excuse and still did not do so. The referee made a finding of fact that Steele had a conversation with Olson in which Steele was advised that all he had to do was bring in medical evidence that he was unable to work and the matter would be resolved.

The record is not clear as to what was said in this conversation which apparently took place when Steele called Olson on July 6 to set up a meeting with the commissioners. Steele does not recall that Olson ad-

3. During the Job Service hearing, Schultz agreed that the policy gives the supervisor the discretion to ask for a medical excuse if he so chooses.

4. Schultz testified that he would not have fired Steele if he had shown up for work on July 6 and given Schultz a reason why he couldn't work, but acknowledges that he didn't express this intent in the June 30 letter.

vised him to bring in a medical certificate. Steele admits that when Olson began talking about something other than the meeting, Steele interrupted him and told him "all I called for is to set up an appointment."

Olson testified that he had no doubt whatsoever that he had informed Steele on July 6 that he should provide a medical excuse. Olson stated that, in fact, Schultz was in the office when he was talking to Steele on the phone, and furthermore, Olson took notes following the conversation. The testimony of Schultz is not consistent with Olson on this point. At one point, Schultz said that Olson called Steele on June 30, even before the letter was sent, and told him to bring in a medical excuse. He then testified that perhaps it was Mervin Steele, Darrel Steele's brother, who had been on the phone with Olson. Olson's notes of the July 6 telephone call(s) also confuse Darrel Steele with Mervin Steele.[5]

Job Service claims that, during the July 7 commission meeting, Olson and Schultz each told Steele to bring in a medical excuse and the matter would be dropped. Job Service argues that Steele's failure to supply such an excuse in response to those requests constitutes misconduct.

At the meeting, Schultz and Steele presented their respective positions to the commissioners. When asked if he had spoken directly to Steele, Schultz testified:

"A Not personally, no. I did say something to him but not right directly to him. I just turned around and said if he come back to work just light duty work I would throw this letter away. It didn't mean nothing.

"Q But that was for the Commissioner's consideration in that, from your prior testimony it was a question of whether or not the Commissioners were going to continue the firing process or not, isn't that correct?

"A I would say so.

"Q So anyway as you understood it the Commissioners were going to make a decision as to what was going to happen with Mr. Steele's employment?

"A That is right."

The testimony of Steele, Schultz, and Olson indicates that Olson also brought up the subject of the medical certificate at the meeting. Steele did not bring a medical certificate to the meeting or obtain one after the meeting. Steele's actions following the July 6 telephone call to Olson to set up the meeting were consistent with an assumption that, once he had requested a meeting with the commission to review the matter, he was no longer dealing solely and directly with Schultz.[6] In light of the fact that the grievance procedure utilized by the county included a review by the county commission, it was not an unreasonable assumption.[7] Furthermore, Schultz' testimony indicates that he also was under the impression that the decision as to Steele's future employment with the road department was in the hands of the commission.

The Job Service referee reasoned that "[t]estimony establishes that the employer did not discharge the claimant because he was unable to work, but rather because he would not provide evidence that he was unable to work...." Further, that "[h]e has refused to comply with a reasonable demand." A reasoning mind could not reasonably conclude that the weight of the evidence supports these findings. Schultz

5. Mervin Steele was also apparently in a situation similar to Darrel Steele in that he worked for Schultz and was injured. Mervin also appeared before the commissioners on July 7.

6. After Steele's 2:00 p.m. doctor's appointment on July 6, he did not stop out at the shop to work. Steele did not talk directly to Schultz at the meeting on July 7. Steele waited to hear from the commission regarding their decision and when he was not contacted, asked his wife to call Olson on July 8. Olson told Mrs. Steele that no decision had been made and all Darrel

could do was talk to Schultz about it. Steele did not call Schultz and Schultz did not call Steele. On July 9, Schultz sent Steele a letter terminating his employment as of July 6.

7. While Steele's assumption that the commission would make a decision whether or not to uphold Schultz' actions may not have been unreasonable, it also was not correct. Schultz apparently had the authority to unilaterally fire employees under his supervision, and it was the policy of the commission to support the actions of the department superintendents.

never directly asked Steele for a medical excuse. The June 30 letter cannot be read as a direct request, although perhaps the intimation is present. It is also unclear whether or not Olson advised Steele to provide a medical excuse, though what bearing a request made by the county auditor would have in this situation is also unclear. Before there can be a refusal, there must be a request. Furthermore, Steele's failure to supply a medical excuse following the commission meeting appears to be the result of a misunderstanding that he was to be informed of the decision of the Board of County Commissioners before he was to take any further action and was not a knowing, deliberate refusal.

The referee concluded that Steele "has been discharged for reasons constituting misconduct within the meaning of the law...."

The term "misconduct" is not defined in the North Dakota Unemployment Compensation statutes, but this Court has applied the definition of that term from *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636, 640 (1941), to the effect that "misconduct":

> "... is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

*See Medcenter One v. Job Service N.D.,* 410 N.W.2d 521 (N.D.1987); *Skjefte v. Job Service North Dakota,* 392 N.W.2d 815 (N.D.1986); *Blueshield v. Job Service North Dakota,* 392 N.W.2d 70 (N.D. 1986); *Olson v. Job Service North Dakota,* 379 N.W.2d 285 (N.D.1985); *Schadler v. Job Service North Dakota,* 361 N.W.2d 254 (N.D.1985); and *Perske v. Job Service North Dakota,* 336 N.W.2d 146 (N.D.1983).

Like most administrative agency determinations, misconduct is a mixed question of fact and law. *Medcenter One, supra,* 410 N.W.2d at 524. Misconduct which may justify discharge may not always justify a denial of benefits under our unemployment compensation laws. *Schadler, supra,* 361 N.W.2d at 256.

Job Service refers us to several cases as supporting its position that Steele's conduct disqualifies him from benefits. In *Nibco, Inc. v. Metcalf,* 1 Ark.App. 114, 613 S.W.2d 612 (1981), it was "undisputed that Metcalf [employee] returned to work for light duty and that Nibco [supervisor] told him he could not go to work until he could return for full duty. It is also undisputed that on four different occasions Nibco wrote Metcalf asking for information about when they could expect him back to work without light duty restrictions.... It is undisputed that Nibco's last two letters were not even answered." *Nibco, supra,* 613 S.W.2d at 615. The court agreed with Nibco that it had a legitimate interest in information concerning when and if injured employees will return to work without light duty restrictions and concluded that the intentional or deliberate failure to furnish such information was a willful disregard of the employer's interest and of the standards of behavior which it had a right to expect of its employees.

In *Darrisaw v. Levine,* 51 A.D.2d 1098, 381 N.Y.S.2d 361 (1976), the employee was absent from work on several occasions, which he attributed to a heart condition. His supervisor informed him several times that he was required to produce a medical certificate from his physician that he was able to return to work. The employee refused to produce the certificate because he thought the employer was unreasonable. The court found substantial evidence in the

record to support the determination of the Unemployment Insurance Appeal Board that the request was not unreasonable and that the employee's refusal to comply with the request constituted misconduct.

In *Patrick v. Com., Unemploy. Comp. Bd. of Review*, 41 Pa.Cmwlth. 238, 398 A.2d 1095 (1979), when the employee left work early complaining of pain in his arm, his supervisor directed him to bring a doctor's certificate when he returned to work. When the employee reported for work without the certificate, he was instructed to leave and not return without it. The employee was absent from work for two days before he returned with the certificate. He was discharged the next day. The court held a failure to comply with the employer's rules regarding absences, particularly after receiving a warning, constituted misconduct.

In *Com., Dept. of Agr. v. Com. Unemploy. Comp.*, 403 A.2d 237 (1979), the employee had been absent without leave and on sick leave on a number of occasions and had been reminded by memorandum that a doctor's certificate was required after three consecutive days of sick leave. She was thereafter reprimanded for tardiness and abuse of sick leave privileges and once again reminded of the doctor's certificate requirement. On October 25, 1976, she called in to report that she was not well enough to work and, when she had not appeared for work on November 3, her supervisor telephoned her and reminded her that a doctor's certificate would be required in order for her absence to be approved. Finally, on January 17, 1977, the employer sent the employee a letter informing her that her services were terminated effective January 4 because she had not reported to work and had not submitted a medical excuse. The court concluded that, having been warned, the employee knew of the requirement and made no attempt to present her employer with medical documentation. This failure to comply with the employer's absence policy constituted misconduct.

In each of these four cases on which Job Service relies as supporting its finding of misconduct, the employer requested a medical excuse from the employee one or more times prior to discharging the employee for misconduct for refusing to comply with the request. In the instant case, no such unequivocal undisputed request was made of the employee by his employer. Schultz testified several times that he did not directly request a medical certificate from Steele. The record contains a letter from Schultz previously quoted and previously found to be something other than a request for a medical excuse. While Schultz indirectly told Steele to provide an excuse at the commission meeting, Steele did not do so because he assumed, perhaps incorrectly, that the matter was no longer under Schultz' control.

In oral argument before this Court, counsel for Job Service contended that the request was implied, but he did not refer us to cases where misconduct was found for failure to comply with an implied request.

We have been presented several times with the issue of whether or not certain actions of an employee constituted misconduct so as to disqualify that employee from unemployment benefits. Perhaps the case which comes closest to the instant case, is *Schadler, supra*, where a nurse's aide failed to report to work when scheduled and failed to notify the nursing home that she would be absent. The nursing home required employees to call in sick if they were unable to work and further required that the employee secure a replacement. Schadler was subsequently discharged for this single unexcused absence. We determined that Schadler's "failure to pick up the phone to explain her absence was a conscious decision on her part. She deliberately chose not to phone the Home, with full knowledge of its policy on absenteeism. Her actions constitute willful misconduct...." *Schadler, supra*, 361 N.W.2d at 257.

Unlike the Baptist Home in *Schadler*, the policy of Stutsman County concerning absenteeism due to sickness or injury does not require the employee to call in sick and find a replacement but rather places the responsibility of requesting a medical cer-

tificate from a sick or injured employee at the discretion of the department head. There was no deliberate decision on the part of Steele to ignore the stated policy of his employer. Instead, he relied on the assumption that he did not have to supply a medical excuse unless he was asked for one.

We hold that, under the circumstances presented here, the actions of an employee with a previously unmarred record, who suffers an on-the-job injury, who voluntarily supplies his employer with an initial medical certificate releasing him from work, who maintains periodic contact with his employer throughout his convalescence, but who fails to return to work upon the demand of his employer prior to being released by his doctor, and who fails to supply an additional medical excuse at the arguably implied request of his employer, while perhaps not being the actions of a sage employee with an eye to future employment, do not constitute willful misconduct so as to disqualify him from receiving unemployment benefits.

We conclude that the finding of fact of Job Service, which in essence determines that Steele refused to submit a medical excuse for his absence from the job, is not supported by a preponderance of the evidence, and accordingly the conclusion of law that his conduct constituted misconduct justifying the decision disqualifying him from job benefits must be reversed. We accordingly reverse with costs on appeal to Steele.

MESCHKE, LEVINE, VANDE WALLE and GIERKE, JJ., concur.