**Tom SIX, Petitioner and Appellant,**

v.

**JOB SERVICE NORTH DAKOTA and
Solen School District No. 3,
Respondents and Appellees.**

Civ. No. 890077.

Supreme Court of North Dakota.

July 17, 1989.

Dietz & Little, Bismarck, for petitioner and appellant; argued by Larry D. Orvik.

David E. Clinton (argued), Asst. Atty. Gen., Job Service of North Dakota, Bis-

(N.D.1979).

marck, for respondent and appellee Job Service.

Pearce & Durick, Bismarck, for respondent and appellee, Solen School Dist. No. 3; argued by Gary R. Thune.

ERICKSTAD, Chief Justice.

Tom Six applied for unemployment benefits from Job Service of North Dakota claiming that he resigned his teaching position with Solen School District No. 3 upon the recommendation of the superintendent of schools. After conducting a hearing, the Job Service referee concluded that Six had not shown good cause attributable to his employer for leaving and, therefore, was not entitled to job insurance benefits. Six appealed and Job Service affirmed the referee's decision. Six then appealed to the district court which affirmed the decision of Job Service. Six has now appealed to this Court. We affirm.

Our review of administrative agency decisions is governed by section 28–32–19, N.D.C.C., and involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Falcon v. Williams Cty. Social Serv. Bd.*, 430 N.W.2d 569 (N.D.1988). When an administrative agency decision is appealed to the district court and then to this Court, we review the decision of the agency and not the decision of the district court. *Bohac v. Graham*, 424 N.W.2d 144 (N.D.1988). We review the record compiled before the agency rather than the findings of the district court. *Falcon v. Williams Cty. Social Serv. Bd., supra.* In determining whether or not the agency's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979).

Six was employed by Solen School District No. 3 in August of 1987 to teach during the 1987–1988 academic year. Apparently some tension developed between Six and the school board regarding his methods of teaching and disciplining students. Although Six had originally been assigned coaching responsibilities, that assignment was withdrawn by the school board.

In late March of 1988, Six met with two officials from the school district, Bruce Meland, the superintendent of schools, and Mr. Hauck about resigning his position. On March 30, 1988, Six submitted a letter of resignation effective May 20, 1988, the last day of school. In the hearing held by the Job Service referee on August 22, 1988, in response to questions posed by the referee, Meland testified in part as follows:

"Q. Was he requested to resign?

"A. He and I and Mr. Hauck talked one day, I suppose about a week before this resignation letter, about probably for his best interests it would be a decision that he ought to consider, yes.

　　*　　*　　*　　*　　*　　*

"Q. Was it made clear to him that he would be nonrenewed if he did not resign?

"A. It was made clear, I believe to Tom, what procedures would, you know, would take place if a nonrenewal were entered into. So—so that he and I, I think, were both clear on that what would take place if it was a nonrenewal procedure. We felt, and I think Tom would agree, in his best interest for his career and what not, it looks better not to have had to go through such a thing as that.

"Q. How's that?

"A. A nonrenewal.

"Q. I see. A resignation looks better.

"A. Looks a lot better, yes."

The Job Service referee states in his decision that

"[a]lthough the superintendent of schools recommended to the claimant

that he resign, the claimant was not required to resign. By law, he was entitled to a hearing which would require the school board to show good cause for not renewing his contract. The claimant failed to avail himself of the protection offered by the law and, therefore, did not take the necessary steps to protect his employment.

"I conclude the claimant has not shown good cause attributable to the employer for leaving and, therefore, is not entitled to job insurance benefits."

An employee who leaves employment "voluntarily without good cause attributable to the employer" is not entitled to unemployment benefits. Section 52–06–02(1), N.D.C.C. " '[W]hether a person left employment "voluntarily" is a mixed question of fact and law, where the evidence must support findings of fact which, in turn, must sustain the conclusion of "voluntariness." ' But, 'it is not possible to determine accurately whether the act of a worker in leaving his job was voluntary unless one takes account of the causes which led to his action.' " *Wahlstrom v. Job Service North Dakota*, 406 N.W.2d 693, 694–5 (N.D.1987).

This Court has previously considered this issue under similar circumstances. In *Carlson v. Job Service North Dakota*, 391 N.W.2d 643 (N.D.1986), Barbara Carlson sought unemployment compensation, claiming that she quit her civilian secretarial job with the United States Air Force only because she was being discharged. Carlson resigned after reading a note on a supervisor's desk which recommended that removal proceedings be started against her. Job Service denied benefits, concluding that Carlson had voluntarily left her employment without good cause attributable to the employer. We reversed the decision of Job Service and held that "an employee who resigns rather than awaiting certain discharge is not disqualified from unemployment compensation." *Carlson v. Job Service North Dakota, supra,* 391 N.W.2d at 646.

At the time the decision in *Carlson* was rendered, section 52–06–02(1), N.D.C.C., provided that an individual is disqualified for benefits after leaving his employment voluntarily without good cause attributable to the employer. The 1987 Legislative Session passed Senate Bill No. 2225, which amended section 52–06–02(1), N.D.C.C., to include the following language:

"For the purpose of this subsection, an individual who left the most recent employment in anticipation of discharge or layoff must be deemed to have left employment voluntarily and without good cause attributable to the employer."

Six argues that this amendment does not preclude him from qualifying for unemployment benefits. He asserts that "the statute applies to those employees who resign because they 'expect' that they will be discharged, and not to situations such as this, where discharge is a certain result."

The interpretation of a statute is a question of law, fully reviewable by this Court. *State v. Bower,* 442 N.W.2d 438 (N.D.1989). Our primary objective in the interpretation of a statute is to ascertain the intent of the legislature. *Peterson v. Heitkamp,* 442 N.W.2d 219 (N.D.1989). We look first to the language of the statute. *Aanenson v. Bastien,* 438 N.W.2d 151 (N.D.1989). If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit. *County of Stutsman v. State Historical Soc.,* 371 N.W.2d 321 (N.D.1985). If a statute's language is ambiguous or of doubtful meaning, we may consider extrinsic aids, including legislative history, along with the language of the statute, to ascertain legislative intent. *First Sec. Bank, Underwood, N.D. v. Enyart,* 439 N.W.2d 801 (N.D.1989).

We believe the intent of the legislature is clear from the language of the statute but it is interesting to note that legislative history also supports the view of Job Service. Mike Wilma, an attorney with Job Service, testified in support of SB 2225 before the House Committee on Industry, Business, and Labor, in pertinent part as follows:

"Job Service has consistently interpreted the voluntary leaving disqualification provision to require a disqualification in cases where an individual leaves employment because the individual anticipates being discharged or laid off. The added language which you find at lines 25 to 29 on page 2 of the bill specifically states this interpretation. We are asking you to consider the addition of this language because of a decision rendered by the North Dakota Supreme Court last July involving a claim for unemployment benefits.... Job Service does believe that this decision changes the application of this law section. Although this is only one decision, it must be noted that this is a North Dakota Supreme Court decision and it does become a precedent which must be applied in all cases of a similar nature. The current interpretation of this law section, based upon this Supreme Court decision, could result in the payment of benefits to numerous individuals who voluntarily leave employment in anticipation of a discharge or layoff."

Duane Houdek, an attorney with Legal Assistance of North Dakota, then testified in opposition to SB 2225, in pertinent part as follows:

"[T]he bill before you goes far beyond dealing with a lay-off situation, and has some effects I'd like to point out for your consideration.

"First, it would apply to anyone who leaves a job even one day before their scheduled termination. For example, if an employer told an employee on Thursday that beginning next week, he is no longer needed, that person is fired. If there is no misconduct involved, that person should become eligible for unemployment benefits effective Monday. But, under this bill, if that employee did not come in on Friday, he would lose *all* his benefits, up to twenty-six weeks worth, because he left in anticipation of discharge.

"The second situation to be considered is where an employer told someone they would be fired at some future date, and that person continued to work up to that date.

"To begin with, it is often a difficult situation when some who had been fired continues to work at the job. But, under this bill, no matter how bad things might get, even if the employer gave the worker every reason to quit early, if the worker did quit, he would lose all benefits. This is creating a no-win situation for the employee. It severely tips the balance between labor and management that you've created in the present law on the books."

After hearing the testimony in support of and in opposition to SB 2225, the House Committee on Industry, Business, and Labor, voted "Do Pass" 13 to 1, with 2 absent. The full House voted to pass SB 2225, 91 to 5. SB 2225 had previously passed in the Senate Committee on Industry, Business, and Labor, 8 to 0, with 0 absent, and in the full Senate, 49 to 4. In amending section 52–06–02(1), N.D.C.C., it is obvious the legislature intended to overrule our decision in *Carlson* notwithstanding vocal opposition to the bill.

■ Under section 52–06–02(1), N.D.C.C., as amended, an employee who leaves his employment in anticipation of discharge or layoff is deemed to have left voluntarily and without good cause attributable to the employer. There are no exceptions stated in the bill. Because Six resigned his position rather than go through the nonrenewal process, he left "voluntarily" and is ineligible for unemployment benefits.

We note that, although application of section 52–06–02(1), N.D.C.C., to the instant case results in Six's ineligibility for unemployment benefits, this is not one of the harsh examples described by Mr. Houdek in his testimony before the House Committee on Industry, Business, and Labor.

Six resigned from a teaching position. Under section 15–47–38(5), N.D.C.C., when a school board is contemplating not renewing a teacher's contract, that teacher has

the right to a hearing. Six, however, contends that he was not entitled to a nonrenewal hearing because he was in his first year of teaching in the School District, and as a first-year teacher, only entitled to a written notification of nonrenewal pursuant to section 15–47–27.1, N.D.C.C.

In 1983, the legislature enacted Senate Bill No. 2394, which became Chapter 230, entitled "Teacher Contract Nonrenewal," which is:

> "AN ACT to create and enact section 15–47–27.1 of the North Dakota Century Code, relating to the renewal and nonrenewal of first-year teachers; and to amend and reenact sections 15–47–26, 15–47–27, and subsection 5 of section 15–47–38 of the North Dakota Century Code, relating to school board procedures with respect to the renewal and nonrenewal of contracts of teachers who have taught for more than one year."

The legislative history of Chapter 230 indicates that the legislature initially contemplated creating a period of probation for the first two years a teacher was employed in a particular school district, during which time the teacher would have no nonrenewal hearing rights. This version, however, was not enacted. The legislature instead chose to limit the probationary status to teachers who are in their first year of teaching.[1] Section 15–47–26, N.D.C.C., states that, for the purposes of nonrenewal, the definition of "teacher" does not include those "teachers who are in their first year of teaching." Furthermore, section 15–47–27.1, N.D.C.C., providing for renewal, nonrenewal, and evaluation of teachers, specifically relates to "every teacher who is in his or her first year of teaching." For purposes of nonrenewal, the legislature distinguished those teachers who are in their first year of teaching from all other teachers with more than one year of teaching experience.

The record reflects that prior to teaching in the Solen School District, Six had been employed for two years by United Tribes as a coach and physical education instructor. Although Six was in his first year of teaching in the Solen School District, it was not his first year of teaching in the profession. Therefore, he was not classified as a first-year teacher and was entitled to the nonrenewal hearing rights accorded to experienced teachers under section 15–47–38(5), N.D.C.C.

For the reasons stated herein, we affirm.

GIERKE, MESCHKE and LEVINE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of VANDE WALLE, J., disqualified.

---

1. The discussion in the House Education Committee seemed to center around the fact that first-year teachers had just completed four years of college and their first year of teaching was the first opportunity school administrators had to observe their techniques and gauge their aptitude as instructors.