David A. SMITH, Appellee and
Cross–Appellant,

v.

NORTH DAKOTA WORKERS COM-
PENSATION BUREAU, Appellant
and Cross–Appellee.

Civ. No. 890047.

Supreme Court of North Dakota.

Sept. 26, 1989.

North Dakota Workers Compensation Bureau, Bismarck, for appellant and cross-appellee; argued by Dean J. Haas, Asst. Atty. Gen.

Joseph F. Larson II (argued), Jamestown, for appellee and cross-appellant.

ERICKSTAD, Chief Justice.

The North Dakota Workers Compensation Bureau appeals from the judgment of the district court reversing the order of the Bureau awarding David Smith a two-year rehabilitation retraining program. Smith cross-appeals from the judgment insofar as it upheld the Bureau's denial of relocation expenses for him to attend college. We affirm the district court on both issues.

Smith was working for Grace–Bomac Drilling Company as a winch truck driver, and was loading drill pipe on June 24, 1984, when a truck caught one of the pipes between its dual wheels and kicked it sideways striking him in the ankle. Smith's ankle was broken in three places. Smith was treated by Dr. Frank Ise of Williston and underwent an open reduction, internal fixation of the fracture. Smith subsequently underwent several more operations in an attempt to increase his range of motion and decrease his symptoms. When Dr. Ise left the community of Williston, Smith began seeing Dr. Charles P. Dahl, an orthopedic specialist in Bismarck. After making several more attempts to decrease the problems Smith was having with his ankle, Dr. Dahl suggested Smith have his ankle fused, which was then done. Although Smith had planned to return to his job with Grace–Bomac, Dr. Dahl advised him to seek a more sedentary occupation which involved no heavy lifting or prolonged walking or standing.

The Bureau had accepted liability for the injury and, once it appeared that Smith would not be able to return to his previous employment, which involved heavy labor, suggested vocational rehabilitation. The Bureau sent Beverly Schoedel, a rehabilitation specialist, to see Smith and talk with him about his career plans.

On his own initiative, Smith went to the adult learning center at the University of North Dakota—Williston and used a computer program designed to inform the user of possible career choices. Smith also went to Job Service North Dakota where he took a general aptitude test battery (G.A.T.B.), spoke with a vocational rehabilitation counselor about financing, and took some interest tests. As a result of the tests, and looking to future employability and promotability, Smith decided to go into accounting, with the goal of becoming a certified public accountant. He decided to attend Valley City State University primarily because his wife had family in that area and because the economy was better than in Williston.

The Bureau sent Smith a rehabilitation contract which provided that the Bureau would pay all reasonable retraining and schooling costs for 21 months in connection with Smith's retraining program in the

area of business management.[1] Smith did not sign this contract, and on March 23, 1987, the Bureau issued an order awarding two years of vocational training benefits. Smith requested a formal hearing, which was held, and then the Bureau issued an order affirming the award of two years of vocational retraining.

Smith appealed to the district court which reversed the Bureau's award of two years of vocational retraining, ordered that Smith was entitled to a rehabilitation program which would reasonably restore his pre-injury earning capacity, upheld the denial of relocation expenses and remanded the case to the Bureau for action in accord with the judgment. The Bureau has appealed from the judgment on the issue of the length of time necessary to vocationally rehabilitate Smith and Smith has cross-appealed on the issue of relocation expenses.

We have often reiterated the standard of review we apply to administrative agency decisions. In *Six v. Job Service,* we stated:

"Our review of administrative agency decisions is governed by section 28–32–19, N.D.C.C., and involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Falcon v. Williams Cty. Social Serv. Bd.,* 430 N.W.2d 569 (N.D.1988). When an administrative agency decision is appealed to the district court and then to this Court, we review the decision of the agency and not the decision of the district court. *Bohac v. Graham,* 424 N.W.2d 144 (N.D.1988). We review the record compiled before the agency rather than the findings of the district court. *Falcon v. Williams Cty. Social Serv. Bd., supra.* In determining whether or not the agency's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency,

but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979)." *Six v. Job Service North Dakota,* 443 N.W.2d 911 (N.D. 1989).

■ The Bureau asserts the issue on appeal is whether or not a two-year vocational retraining allowance is sufficient to return Smith to reasonable and substantial employment. Smith argues that four years of rehabilitation retraining is necessary to restore him to his pre-injury earning capacity. The first question we must answer, therefore, is to what extent an injured worker must be rehabilitated under the Workmen's Compensation Act.

The Bureau refers us to *Levey v. N.D. Workers Compensation Bureau,* where this Court had affirmed the Bureau's award of two years of vocational rehabilitation due to the fact that the record supported a finding that there were "numerous two-year-degree programs for persons interested in mathematics and science which would qualify a person for employment." *Levey v. N.D. Workers Compensation Bureau,* 425 N.W.2d 376, 377 (N.D. 1988). However, we find *Levey* to be distinguishable. The extent of pre-injury earning capacity to which a claimant is entitled to be restored was not raised by Levey in his brief or in the petition for rehearing. Our opinion, therefore, did not address this issue. In the instant case, the pre-injury earning capacity and the potential income in a given area of employment are crucial to the determination of whether or not a two-year vocational retraining program is sufficient to rehabilitate Smith. As we do not find our holding in *Levey* to control the outcome in this case, we look for guidance to the North Dakota Century Code.

Chapter 65–05.1 of the North Dakota Century Code is entitled "Rehabilitation

---

**1.** The contract included a provision "[t]hat upon completion of the rehabilitation retraining program, the claimant will be deemed qualified for *gainful* employment within his chosen vocation." [Emphasis added.]

Services."[2] At the time Smith was injured, section 65–05.1–01, N.D.C.C., provided in pertinent part:

"It is the purpose of this chapter to provide for the health and welfare by ensuring to workmen's compensation claimants otherwise covered by this title, services, so far as possible, necessary to assist the claimant and the claimant's family in the adjustments required by the injury to the end that the claimant may receive comprehensive rehabilitation services. Such services shall include medical, psychological, economic, and social rehabilitation."

Subsection 5 of section 65–05.1–02, entitled "Bureau responsibility" stated that bureau shall "[p]rovide such rehabilitation services and allowances as may be determined by the bureau to be most beneficial to the claimant within the limits of this chapter."

Section 65–05.1–04, N.D.C.C., entitled "Injured worker responsibility" stated in pertinent part that:

"It shall be the responsibility of the injured worker to seek, obtain, and retain *reasonable and substantial employment* in order to reduce the period of temporary disability to a minimum. In the event that the injured worker is unable to obtain *substantial employment* as a direct result of his injury he shall promptly notify the bureau and thereafter be available for such examinations and testing as may be prescribed by the bureau to determine whether or not a program of rehabilitation is necessary. If the bureau determines that a program of rehabilitation is necessary and feasible, the injured worker, upon having been so notified, shall be available for such a program." [Emphasis added.]

No other mention is made in chapter 65–05.1, N.D.C.C., to what extent an injured worker must be rehabilitated. In *Six v. Job Service, supra,* we said:

"The interpretation of a statute is a question of law, fully reviewable by this Court. *State v. Bower,* 442 N.W.2d 438 (N.D.1989). Our primary objective in the interpretation of a statute is to ascertain the intent of the legislature. *Peterson v. Heitkamp,* 442 N.W.2d 219 (N.D. 1989). We look first to the language of the statute. *Aanenson v. Bastien,* 438 N.W.2d 151 (N.D.1989). If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit. *County of Stutsman v. State Historical Soc.,* 371 N.W.2d 321 (N.D.1985). If a statute's language is ambiguous or of doubtful meaning, we may consider extrinsic aids, including legislative history, along with the language of the statute, to ascertain legislative intent. *First Sec. Bank, Underwood, N.D. v. Enyart,* 439 N.W.2d 801 (N.D.1989)." *Six v. Job Service, supra,* 443 N.W.2d at 913.

Chapter 65–05.1, N.D.C.C., was enacted by the 1975 Legislative Session in chapter 584. In our review of the legislative history of chapter 65–05.1, N.D.C.C., we find no discussion regarding the extent to which an injured worker should be rehabilitated. The drafter's notes to Senate Bill No. 2145, which became chapter 584, state that "[t]he term 'comprehensive rehabilitation services' is the key to this bill. It is quite evident that the Bureau must supply more than simply vocational training in the area of rehabilitation."

In light of the drafter's notes, and subsequently the purpose of the chapter as stated in section 65–05.1–01, N.D.C.C., we conclude that an injured worker must be rehabilitated to something more than mere gainful employment.[3] There is no indica-

---

**2.** Portions of chapter 65–05.1, N.D.C.C., were significantly amended during the 1989 Legislative Session. Smith was injured in 1984, and the determination to award rehabilitation benefits was made in 1987. As 1989 Session Laws chapter 771, amending and reenacting portions of chapter 65–05.1, N.D.C.C., does not clearly express an intent that the amendments were to apply retroactively, the amendments must be applied only prospectively. *See* section 1–02–10, N.D.C.C. *Fairmount Tp. Bd. of Sup'rs v. Beardmore,* 431 N.W.2d 292 at 294 (N.D.1988).

**3.** *See* footnote 1, *infra.*

tion in the language of the chapter, or in the legislative history, that the legislature intended that a worker be rehabilitated, dollar for dollar, to his pre-injury earning capacity. There is, however, language in section 65–05.1–04, N.D.C.C., which refers to a standard of "reasonable and substantial employment." We therefore conclude that the purpose of a vocational retraining program is to *substantially* rehabilitate a worker to his pre-injury earning capacity.[4]

Having concluded that the purpose of chapter 65–05.1, N.D.C.C., is to substantially rehabilitate an injured worker's earning capacity, we must determine what is meant by the term "substantially." The Bureau does not provide us with any insight on this definition but implies that "substantial" employment is something less than a return to pre-injury earning capacity, as evidenced by the suggestion that if a "wage discrepancy remains after retraining, partial disability benefits are available pursuant to N.D.C.C. § 65–05–10."

Smith refers us to Black's Law Dictionary which defines "substantially" as "Essentially; without material qualification; in the main; in substance; materially; in a substantial manner. About, actually, competently, and essentially." *Black's Law Dictionary*, p. 1281 (5th Ed.1979). Smith then claims that accountants have a rule of thumb that considers anything above 10 percent to be material. Absent a contrary suggestion from the Bureau, we will apply this "10 percent rule" and conclude that a claimant is substantially rehabilitated if he can be employed to within 10 percent of his pre-injury earning capacity.

As we have concluded that, in order to substantially rehabilitate an injured worker, he or she must be able, upon completion of the retraining program, to be employed at least at 90 percent of the pre-injury earning capacity, we must determine whether or not a two-year vocational retraining program will substantially rehabilitate Smith. Although the Bureau argues that pre-injury earning capacity is a "red herring" issue, it is central to a determination of what income level is necessary to substantially rehabilitate Smith.

After holding a formal hearing, the Bureau issued an order awarding rehabilitation benefits in which it made findings of fact including:

### "XVIII.

"Prior to claimant's injury, claimant earned approximately $6,000.00 in 1974, approximately $12,000.00 in 1975, approximately $12,000.00 in 1976, under $5,000.00 in 1977, approximately $7,000.00 in 1978, approximately $10,000.00 in 1979, approximately $17,000.00 in 1980, approximately $24,000.00 in 1981, approximately $24,000.00 in 1982, and approximately $26,000.00 in 1983. Claimant was injured in 1984 and his income level thereafter deteriorated somewhat. Claimant's pre-injury earnings capacity must be based upon his entire work history, rather than only his most recent occupation.

\* \* \* \* \* \*

### "XXII.

"Claimant's earning capacity following a 2 year vocational rehabilitation is sub-

---

**4.** The Bureau also appears to have concluded that the goal of rehabilitation is not mere gainful employment and relies on the term "substantial." In its brief to this Court, the Bureau asserts that:

> "[w]here a worker's earnings capacity can be *substantially* rehabilitated through two year programs as well as through four year programs, the Bureau has met its obligation by making an award of two years.... The issue, thus framed, is whether the Bureau's award of two years of retraining is sufficient, where evidence indicates it will serve to *substantially restore earnings capacity*." [Emphasis added.]

However, after applying the "substantial" standard to earning capacity in order to determine whether or not a two-year award is sufficient, the Bureau asserts that pre-injury earning capacity is a "red herring" issue and "the Bureau need only provide vocational retraining benefits to enable the worker to obtain 'reasonable and substantial employment.'" We think it inconsistent for the Bureau to frame the issue as it chooses, to include the measure of earning capacity when determining whether or not two years of retraining is sufficient, and then except the measure of earning capacity when determining whether or not the retraining enables the worker to obtain substantial employment.

stantially equivalent to, or higher than claimant's pre-injury earnings capacity where he earned an average of $14,-300.00 per year from 1974 through 1983."

When we review the findings of fact made by an administrative agency, we determine whether or not a reasoning mind could reasonably determine that they are supported by the weight of the evidence. *Six v. Job Service, supra.*

The Bureau asserts that Smith's earning capacity must be measured over his entire work history, and, in making its calculation, include the years he worked immediately after being graduated from high school, the year he was taking carpentry courses at UND—Williston, but fail to include his salary for the year Smith was injured or the salary for the months he worked the year after the injury. We conclude, as did the district court, that this is not an equitable method of calculating a claimant's earning capacity.[5]

While we do not find the method used by the Bureau to calculate earning capacity to be equitable, we also will not automatically apply the method Smith advocates, using the basic rate of pay at the time he was injured. Instead, we will look for guidance to the legislature.

At the time of Smith's injury, there was no provision in the North Dakota Workers Compensation Act for calculating a claimant's earning capacity. However, the 1989 Legislature substantially amended several sections of chapter 65-05.1, N.D.C.C. Section 65-05.1-01(3), N.D.C.C., now reads:

"It is the goal of vocational rehabilitation to return the disabled worker to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs. 'Substantial gainful employment' means bona fide work, for remuneration, which is reasonably attainable in light of the individual's injury, medical limitations, age, education, previous occupation, experience, and transferable skills, and which offers an opportunity to restore the worker as soon as practical and as nearly as possible *to the worker's average weekly earnings at the time of injury,* or to the average weekly wage in this state on the date the rehabilitation consultant's report is issued under section 65-05.1-02.1, whichever is less." [Emphasis added.]

We acknowledge that subsequent legislative interpretation of a statute is not conclusive of the meaning of the former statute. 2A Sutherland Stat. Const. § 49.11, p. 414 (4th Ed.1984). We will, however, give consideration to subsequent legislation in this case as it will fill the void otherwise existing in the legislation, and it seems more appropriate than for us to fill the void through judicial fiat.

In section 65-05.1-01(3), N.D.C.C., the legislature states that the goal of vocational rehabilitation is to return the disabled worker to substantial gainful employment as measured by the worker's average weekly earnings at the time of the injury. We think this is a reasonable formula for calculating earning capacity and we will use it as a guide.

■ A copy of Smith's W-2 form for the year 1984 was admitted into evidence at the hearing held by the Bureau. The W-2 form indicated Smith earned $21,412.00 in 1984. Handwritten notes on the 1984 W-2 form indicate Smith lost ten weeks of wages due to injury. Smith calculates his average weekly wage, over 42 weeks, to be $510.00. This amounts to a yearly salary of approximately $26,520.00, and an hourly wage of approximately $12.75.

Based upon our calculations of Smith's salary under the method suggested in the 1989 amendment to section 65-05.1-01(3), N.D.C.C., we hold that a reasoning mind could not reasonably conclude that the Bureau's finding of fact that Smith's earning

---

5. Notwithstanding that we review the evidence in light of the findings of the Bureau, we note that the trial court reversed the Bureau for two reasons. The first error made by the Bureau, according to the trial court, was in the method by which it calculated Smith's average wage, and the second was that it failed to take into account the experience Smith had gained while working for Grace-Bomac Drilling Company.

capacity equaled $14,300.00 is supported by a preponderance of the evidence.[6]

Having decided that Smith must be rehabilitated to the point where he can earn at least 90 percent of his pre-injury earning capacity, and that this amount equals approximately $23,868 per year [$26,520 × .90] or approximately $11.48 per hour [$12.75 × .90], we must determine whether or not the two-year vocational retraining programs proposed by the Bureau meet this income level.

Two vocational training experts presented evidence at the hearing regarding wages and job opportunities in various fields following two-year and four-year vocational training programs. Smith had requested, and was granted, the opportunity to hire an expert in vocational counselling at the Bureau's expense. On May 1, 1987, the Bureau notified Smith's counsel that the Bureau also intended to call an expert witness and that Smith would be given the name of this witness in advance.

On July 11, 1987, Smith filed a request for "the opportunity to cross-examine any person furnishing information which the Bureau wishes to consider relative to this claim for workmen's compensation benefits. This request is deemed continuing unless revoked in writing by the claimant." The same day, Smith also filed a request for production of documents "for the purpose of inspecting and copying all documents and writings which the Bureau wishes to consider relative to this claim for workmen's compensation benefits and any items which the Bureau may offer as exhibits in the formal hearing of this claim."

We have been shown no evidence in the record that indicates the Bureau gave the name of its expert to Smith prior to the hearing,[7] nor that an effort was made to provide any *particular* documents to Smith. At the hearing, Smith's counsel objected to testimony presented by Ardis Huss, the Bureau's expert, on the basis that the Bureau had failed to comply with his requests for cross-examination or production of documents. Huss was allowed to testify.

However, Huss had never met Smith but merely reviewed the reports written by Beverly Schoedel. Schoedel was not present at the hearing, nor were her reports entered into evidence at the hearing, although they were included in the record to the district court. While Smith, therefore, had the opportunity to cross-examine Huss, he did not have the opportunity to cross-examine Schoedel or review the reports she prepared.

In *Froysland v. N.D. Workers Comp. Bureau*, 432 N.W.2d 883, 889 (N.D.1988), we said that:

"When the Bureau retains experts, whose opinions it uses to refute the claimant's treating physician, and then refuses cross-examination of those experts unless paid for by the claimant, it effectively denies most claimants a real opportunity to prove their entitlement to benefits. If section 28–32–09, N.D.C.C., is read to permit such a procedure, a potential due process violation may exist. In order to avoid finding such a violation, we construe section 28–32–09, N.D.C.C., to require the Bureau to bear the costs of discovery of its expert witnesses upon whom it primarily relied, where such witnesses were originally retained by the Bureau, and where their expert opinions were relied upon to refute the testimony and conclusions of the claimant's treating physician."

While the issue in the instant case involves vocational training experts and not medical professionals, we think the rule set

---

**6.** Smith asserted that the Bureau erred in failing to take inflation into account when calculating his earning capacity. In *Walker v. Omdahl*, we held that the legislature may provide for inflationary increases in the cost of living for state officials as official expenses, without violating the State Constitution. *Walker v. Omdahl*, 242 N.W.2d 649, 657 (N.D.1976).

As we are using the 1989 legislative amendments previously referred to as a guide to fill the void in the law, we will not consider what effect inflation may have in calculating earning capacity by other means.

**7.** The record contains an interoffice memo dated 6/?/87 informing counsel for the Bureau that the Bureau's expert would be Ardis Huss.

forth in *Froysland* is just as applicable here. Huss was hired by the Bureau to refute the testimony of Mary Dyer, the claimant's expert. Huss then relied primarily upon reports written by Schoedel. Because it does not appear from the record that the Bureau made Schoedel or her written reports available to Smith, even though he had requested that they do so, and because it appears the Bureau did not disclose to Smith the identity of its expert, Huss, prior to the hearing, or the substance of her expected testimony so that counsel for Smith could adequately prepare for cross-examination, the conclusions drawn by Huss are not properly before us for review.

■ Were we to give credence to the testimony of Huss, we note that for the most part, she agrees with Mary Dyer, the vocational training expert hired for Smith. Dyer testified that, in light of the interest tests Smith took, and his G.A.T.B. results, it is reasonable that he chose vocational training in the area of accounting. Dyer said that a two-year associate arts degree in accounting basically qualifies a person for accounting clerk or bookkeeper positions, which are nonprofessional, clerical positions. A four-year degree in business administration with an emphasis in accounting would make a person eligible for entry-level accounting positions, which are professional positions based on a salary.

Dyer had prepared a labor market analysis conducted in North Dakota in which she compared employment opportunities in the accounting field for persons with a two-year associate degree and a four-year bachelors degree. Dyer found that the wage differential between an entry level wage for a person with a two-year degree and an entry level wage for a person with a four-year degree to be approximately $10,000. The hourly wage for a position available to a person with a two-year degree was in the range of $4.50 or $5.00 to $7.00 per hour. The wage for a person with a four-year degree was about $8.00 to $11.00 per hour. She testified that the top of the wage scale for a person with a two-year degree was $17,000 to $20,000 per year, while the person with a four-year degree had a much greater opportunity for wage promotions. She also testified that the job outlook, in terms of job opportunities, was more positive for a person with a four-year degree than for a two-year degree.

Huss agreed that there was a significant difference in the earning capacity and potential of someone who had a two-year degree and someone with a four-year degree. She also agreed that the results of Smith's interests tests and G.A.T.B. indicate that he has an interest and aptitude for accounting. She testified, however, that those same tests indicated that he had the ability to do well in several other vocational fields.

Huss, in response to questions posed by Bureau's counsel testified:

"Q  Now, according to his aptitude testing as reflected by the G.A.T.B. could you indicate what other specific vocational opportunities would be available to him given sedentary employment as well?

"A  Well, the next thing that's listed here given with the general aptitude test results are sample jobs and the aptitude of Mr. Smith is related to that job. I've underlined the areas that he would have opportunity to at least get training in and should do well if he does receive training.

"Q  Could you read some of those?

"A  I just wanted to indicate that he's very high. He's the kind of client you like to work with. Some of the things of course he might not have an interest in, but it lists literary arts, performing arts-drama, performing arts-music, performing arts-dance, craft arts.

"But getting on down he's high in managerial work-mechanical, craft technology, materials control, and into the areas that he's interested in administrative, mathematical detail, financial detail, oral communication, clerical handling, finance, service administration, business management, contracts and claims, just to mention a few because if we—this is entered into the exhibits and it does indicate he's very high in the numbers.

"Q Would his aptitude be consistent with a degree in mechanical drawing, drafting and estimating at North Dakota State School of Science?

"A I believe it would."

While Huss testified Smith had tested high in aptitude in areas not related to accounting, she did not testify that his interests in those areas tested equally high.

Huss provided figures from the 1986 North Dakota Wage and Benefit Survey prepared by Job Service which indicated that there are some vocational opportunities with a two-year degree that offer beginning level incomes equivalent to that made by an accountant. She testified that, for example, an estimator/drafter might make an hourly wage of $11.09 to $12.89; a computer operator might make $6.22 to $7.94 per hour; a lumber store manager might make $7.96 to $9.67 per hour; and a mechanical drafter might make $8.81 to $12.58 per hour. However, Huss also provided figures for persons with a two-year degree in accounting, and employed by the State of North Dakota, which indicated that such a person might make only $6.66 to $8.70 per hour.

The Bureau acknowledges that, under the law applicable to this case, a person is entitled to make his or her own career choice and cannot be compelled to enter into a particular vocational retraining program. The Bureau argues, however, that it cannot be held hostage to a worker's interests and be required to pay the cost of any program that interests the worker. The Bureau claims that it has met its responsibility to provide rehabilitation benefits, by awarding Smith two years of vocational retraining, because there are some two-year programs that would substantially restore his pre-injury earning capacity. The Bureau apparently does not place value on employability and subsequent opportunities for promotion.

■ We believe that Smith should be entitled to pursue training in his field of interest when within reason, particularly when his preference for training would provide him with greater opportunities for employment and advancement.

A two-year program in accounting would give Smith the opportunity to make $6.66 to $8.70 per hour, according to Huss, or $4.50 to $7.00 per hour according to Dyer. Huss did not have figures for the hourly wage available to a person with a four-year degree while Dyer asserted the wage range was in the area of $8.00 to $11.00 per hour. We concluded earlier, that to be substantially rehabilitated to his pre-injury earning capacity, Smith must make between $11.48 and $12.75 per hour. It appears that this cannot be done with a two-year degree in accounting, but could possibly be done after completing a four-year degree.

As the Bureau's finding of fact that the "[c]laimant's earning capacity following a 2 year vocational rehabilitation is substantially equivalent to, or higher than claimant's pre-injury earnings capacity where he earned an average of $14,300.00 per year from 1974 through 1983" is not supported by a preponderance of the evidence, its conclusion of law that a two-year program is sufficient to rehabilitate Smith's earning capacity to substantially his pre-injury earning capacity is erroneous and thus the decision based thereon cannot stand.[8] We therefore sustain the judgment of the district court which reversed the decision of the Bureau. We make this decision fully cognizant of that fact that our holding here has limited precedential value in light of the amendments to chapter 65–05.1, N.D. C.C., made by the 1989 Legislature which limits training to one hundred four weeks except in cases of catastrophic injury.[9]

8. In the conclusions of law contained in the Bureau's order awarding rehabilitation benefits, the Bureau stated:
"V.
"A two year program is sufficient to rehabilitate claimant's earning capacity to substantially his pre-injury earnings capacity."

9. 1989 N.D.Sess.Laws Ch. 771, section 5(2)(c)(2), reads.

"c. The rehabilitation allowance must be limited to one hundred four weeks except in cases of catastrophic injury, in which case additional rehabilitation benefits may be awarded in the discretion of the bureau. Catastrophic injury includes:

■ In addition to a four-year vocational retraining program, Smith argues that he is entitled to reimbursement for the expenses he incurred in relocating to Valley City to attend college. Smith asserts that, not only are such expenses impliedly provided for under section 65–05.1–01, N.D. C.C., as "economic" rehabilitation, but are also authorized under section 65–05.1–06, N.D.C.C.

At the time of Smith's injury, section 65–05.1–06, N.D.C.C., provided in pertinent part that:

"In the event the claimant successfully concludes the terms of the contract, additional awards, not to exceed a total of five thousand dollars for the life of the claimant, regardless of any subsequent claim, can be made for the actual expenses of relocation or remodeling of living and business facilities as the claimant's condition may require."

There are two reasons why this statute does not require the Bureau to pay Smith's expenses to relocate to Valley City to attend college. First, Smith did not incur the relocation expenses after successfully completing the terms of a rehabilitation contract, but prior to beginning a retraining program. There is nothing in the language of the statute to indicate the legislature intended to require the Bureau to pay relocation expenses for claimants regardless of whether or not the claimant successfully completed his or her particular rehabilitation program. Furthermore, the statute indicates that additional awards *can* be made for actual relocation expenses. By applying the basic rules of statutory interpretation, we conclude that "can" as compared to "must" or "shall" indicates that the legislature intended that the Bureau have discretion whether or not to make the award. Absent an indication by the legislature to the contrary, we will not read section 65–05.1–06, N.D.C.C., to require the Bureau to pay expenses incurred by a claimant in relocating in order to take ad-

vantage of a vocational retraining program.

Lest a failure to respond to the dissent were to be taken as agreement with it, we will respond briefly.

The dissent asserts the belief that *Levey* controls this case and disagrees with the "rationale employed by the majority to reach a desired result."

We have already explained why we believe *Levey* is not controlling and thus will not repeat our reasoning on that issue. As for the rationale employed to reach a desired result, it should be noted that the majority opinion was not written to reach a desired result on the part of this court, but was written in an effort to discern the intent of the legislature, which some might say was in an effort to discern the result desired by the legislature.

We have attempted to give reasonable meaning to the word "substantial" when the legislature did not define the term and when it did not limit the time for training that might be required to return the injured worker to substantial employment.

There is language in the Workmen's Compensation Act from its origin which requires us to liberally construe the act for the benefit of those covered by it. In this connection, in *Brown v. North Dakota Workmen's Compensation Bureau*, 152 N.W.2d 799, 801 (N.D.1967), we said:

"The legislature, in establishing the Workmen's Compensation Bureau and the fund from which the benefits are paid, asserted that the prosperity of this state depends in a large measure upon the well-being of its wageworkers; and to secure this prosperity it provided sure and certain relief for workmen injured in hazardous employment and for their families and dependents. § 65–01–01, N.D.C.C.

"As a corollary to the policy set forth in that section, this court has said that

* * * * * *
"(2) Those workers the bureau so designates, in its sole discretion, provided that the bureau finds the worker to be permanently and totally disabled without further vocation-

al retraining assistance. There is no appeal from a bureau decision to designate, or fail to designate, a worker as catastrophically injured under this subsection."

the workmen's compensation act must be liberally construed to promote the ends intended to be secured by its enactment. *Erickson v. North Dakota Workmen's Compensation Bureau*, 123 N.W.2d 292, 294 (N.D.1963)."

We think it is reasonable to assume that the legislature intended the amendments to the act in 1975 providing for rehabilitation services to also be liberally construed when it said:

"It is the purpose of this chapter to provide for the health and welfare by ensuring to workmen's compensation claimants otherwise covered by this title, services, so far as possible, necessary to assist the claimant and the claimant's family in the adjustments required by the injury to the end that the claimant may receive comprehensive rehabilitation services. Such services shall include medical, psychological, economic, and social rehabilitation." § 65–05.1–01, N.D. C.C.

The dissent asserts that "there is an inconsistency in ignoring the 1989 legislation limiting the period of education to two years and yet relying on the 1989 legislation amending Section 65–05.1–01(3) to conclude that the rehabilitation is to return the disabled worker to substantial gainful employment as measured by the worker's average weekly earnings at the time of the injury. Those two provisions should be used together, as the Legislature intended, or not used at all."

Our view is that we are not applying the 1989 legislation, for to do so would be to apply it retroactively which we have previously said in this opinion should not be done because of the statutory and case law earlier set forth herein. Were we actually attempting to apply the 1989 legislation, we would then concede that our first responsibility in construing the statute would be to harmonize the inconsistent provisions so as to attempt to accomplish the objectives of both provisions. That is not the situation here where we believe we have the duty to apply a reasonable formula or apply reasonable factors to accomplish the basic objectives of the 1975 legislation. We utilize

the particular provisions we have selected as a guideline or standard in light of the absence of a limitation in time of training in that legislation.

While we have discovered no jurisdictions which have defined the word "substantial" in relation to employment, certain jurisdictions have interpreted their statutory language to determine to what level of earning capacity an injured claimant should be returned, and most have done this without specific legislative guidelines.

The Court of Appeals of Oregon stated that:

"Workers' compensation was developed not just to compensate a worker who has been injured on the job, but also to enable the worker to reenter the job market and become employed again in a position as near as possible in pay and status to the one the claimant has been forced by injury to leave." *Frame v. Crown Zellerbach*, 63 Or.App. 827, 828–29, 665 P.2d 879, 880–81 (1983).

In *Frame* the worker was to be returned to "gainful employment," which the Court said, in light of the workers' compensation statutes and regulations, "must bear a reasonable relationship to an individual's experience and background, including prior earnings." *Id.* 665 P.2d at 881. It did so after stating that as "[t]here are no specific guidelines to determine what 'as near as possible' means; it must be determined on a case by case basis." The Court found that the minimum wage jobs the claimant could get after the injury were one-third of his pre-injury earnings, and they were not "gainful employment." *Id.* The Court held that the claimant was entitled to a program of rehabilitation, notwithstanding he could obtain work paying the minimum wage without retraining. *Id.* In adhering to its former opinion on petition for reconsideration, the appeals court said:

"We reiterate our opinion that the workers' compensation statutes were not intended to force an injured worker to take a drastic cut in pay instead of being trained for a job paying a comparable wage to what the worker would have been making had he not been injured."

*Frame v. Crown Zellerbach,* 65 Or.App. 801, 802, 672 P.2d 70, 71 (1983).

The Court of Appeals of Oklahoma also interpreted a similar statute. *See Solo Cup Co. v. Brown,* 660 P.2d 655 (Okl.App. 1982). The Oklahoma statute contained the language "to restore him to gainful employment." *Id.* at 657. In emphasizing the word "restore" over the words "gainful employment," the Court defined "restore" as "to put (a person) back in a former position, place, rank, or condition...." *Id.* at 657–58. In a situation where a worker cannot be returned to the entire range of his former employment potential and earning capacity, the Court said:

> "the law contemplates rehabilitative restoration as nearly as possible to the worker's pre-injury status taking into consideration the type of work the worker was doing at the time of the injury, his income level and earning capacity, his vocational aptitude, his mental as well as physical abilities and other relevant circumstances." *Id.* at 658.

The Court affirmed an order requiring the employer to pay for 30 months of jewelry training for the claimant. *Id.* at 659.

Several other jurisdictions have also interpreted similar statutory language. *See Norris v. Ed Taylor Corp.,* 484 So.2d 64 (Fla.App. 1 Dist.1986) (claimant awarded rehabilitation in electronics program where restoring to suitable gainful employment was defined as returning an individual as nearly as possible to his average weekly earnings at the time of the injury); *Thom v. Lutheran Medical Center,* 226 Neb. 737, 414 N.W.2d 810 (1987) (two-year accounting and computer award which will lead to a bachelor's degree upheld as reasonably necessary to "restore ... to suitable employment" where claimant suffered a 25 percent loss of earning power); *Gilmore v. Little Jack's Steak House,* 292 N.W.2d 14 (Minn.1980) (156 weeks of retraining in accounting and business administration allowed where retraining for a new occupation would significantly reduce or remove any reduction in employability caused by the injury).

While some jurisdictions have denied rehabilitative awards to injured workers, those cases are distinguishable on their facts or the applicable law. The South Dakota Supreme Court denied a four-year rehabilitation award in *Barkdull v. Homestake Min. Co.,* 411 N.W.2d 408 (S.D.1987). The South Dakota statutory language was "to restore the employee to suitable, substantial and gainful employment." The claimant, a former miner, enrolled in a four-year college degree program in business administration three years after his injury. *Id.* at 409. The Court denied rehabilitation compensation for the program, finding that "suitable employment opportunities existed for Barkdull, even without a college education." *Id.* at 410. Barkdull had been employed after his injury as a welding instructor, and the Court concluded that there were numerous employment opportunities with salaries ranging from $12,000 to $25,000 in Barkdull's chosen field which allowed entry without a college degree. *Id.* The Court stated:

> "The kind of rehabilitation program contemplated by SDCL 62–4–5.1 is that which enables the disabled employee to find suitable and gainful employment, not to elevate his station in life." *Id.*

There was no evidence of Barkdull's pre-injury wages nor of his aptitude for such training. The Court concluded that the rehabilitation program was excessive because it would have allowed the injured worker to improve his station in life, rather than just restore him to suitable and gainful employment. In the case at hand, even the four-year degree would not initially return the claimant to his pre-injury earning capacity.

A Virginia statute called for "reasonable and necessary vocational rehabilitation training services." *City of Salem v. Colegrove,* 228 Va. 290, 321 S.E.2d 654, 655 (1984). The Virginia Supreme Court had previously interpreted the statute to require retraining for a "specific skill or trade." *Id.* 321 S.E.2d at 656. The claimant, a former refuse collector, sought rehabilitative compensation for a four-year accounting degree. *Id.* at 655. The Virginia Supreme Court held that such a program

was outside the terms of the Virginia statute as previously interpreted. *Id.* at 656. The Virginia statute did not contain descriptive language, such as "substantial," "suitable," or "gainful" employment. The statute called only for "reasonable and necessary vocational rehabilitation training services." *Id.* Thus, there was no requirement that the claimant be returned to any certain level of employment, as we have construed our statute to require after giving meaning to the word "substantial."

An Alabama statute allowed for vocational rehabilitation "reasonably calculated to restore the employee to gainful employment...." *Ex Parte Beaver Valley Corp.*, 477 So.2d 408, 410 (Ala.1985). The Alabama Supreme Court defined restore as meaning "to put back." *Id.* at 412. Gainful employment was defined as "employment similar in remuneration to that earned prior to the injury." *Id.* In *Beaver Valley*, the claimant, a former laborer, with a college degree in business administration from the University of Monticello, who had also taken classes at a state junior college in real estate, and at the University of Alabama in engineering, sought a rehabilitation award of three and a half years for undergraduate and master's degrees in computer science at the University of Alabama at Birmingham. *Id.* The Court denied such an award and remanded for further proceedings, stating:

> "Rather than restoring Respondent to his pre-injury economic status, the program approved by the lower courts would allow Respondent to improve his

station in life at the expense of Beaver Valley." *Id.*

Again, it should be noted that, in our case, an award of four years of rehabilitation would still leave the claimant, at entry level income, short of his pre-injury economic status.

Thus, in the absence of a legislative definition of the word "substantial," we believe that it is reasonable, in light of the case law we have considered, to require that injured workers otherwise qualified receive training which would restore them to 90 percent of the workers' average weekly earnings at the time of their injury.

■ As for the contention that we are bound by the administrative practice of the Bureau to allow a maximum of two years of training, it should be noted that that practice, if it exists, was not established in this case. But if we were to take judicial notice of such a practice from *Levey*, we think it is elementary that even long established administrative practice or policy can and must be set aside if it is found, after careful study, to violate the intent of a statute. If the dissent is saying that because the Bureau has a practice of limiting rehabilitation training to two years we should give credence to that practice and therefore construe the statute as limiting rehabilitation to two years, we think that is unacceptable in light of the Administrative Agencies Practice Act (Ch. 28–32, N.D.C.C., especially section 28–32–02, subsections (3) and (7), N.D.C.C.[10]).

Also significant is the following:

10. "*28-32-02. Rulemaking power of agency—Adoption deadlines—Hearing notice—Emergencies—Attorney General's opinion.*

\*    \*    \*    \*    \*    \*

"3. The agency shall adopt a procedure whereby all interested persons are afforded reasonable opportunity to submit data, views, or arguments, orally or in writing, concerning the proposed rule, including data respecting the impact of the proposed rule. In case of substantive rules, the agency shall conduct an oral hearing. The agency shall consider fully all written and oral submissions respecting a proposed rule prior to the adoption, amendment, or repeal of any rule not of an emergency nature. The agency shall make a written record of its consideration of all written

and oral submissions contained in the rulemaking record respecting a proposed rule.

\*    \*    \*    \*    \*    \*

"7. Every rule proposed by any administrative agency must be submitted to the attorney general for an opinion as to its legality before final adoption, and the attorney general shall promptly furnish each such opinion. The attorney general may not approve any rule as to legality when the rule merely repeats or paraphrases the text of the statute purported to be implemented by the rule. The attorney general may not approve any rule as to legality where the rule exceeds the statutory authority of the agency or is written in a manner that is not concise or easily understandable. The attorney general may suggest any revision or

"1. A copy of each rule adopted by an administrative agency, and the attorney general's opinion thereon, must be filed by the adopting agency with the office of the legislative council for publication in the North Dakota Administrative Code." § 28–32–03(1), N.D.C.C.

Neither our examination of the record nor our examination of the Administrative Code discloses that the Workers Compensation Bureau has adopted an administrative rule, incorporating the alleged administrative practice or policy.

We have said that "the practical construction of a statute by the agency administering the law is entitled to some weight in construing the statute, especially where the agency interpretation does not contradict clear and unambiguous statutory language." *Application of Skjonsby Truck Line, Inc.*, 357 N.W.2d 227, 231 (N.D.1984). *See also, Clapp v. Cass County,* 236 N.W.2d 850, 856 (N.D.1975); *In re Dilse,* 219 N.W.2d 195, 200 (N.D.1974); *State Tax Commissioner v. Tuchscherer,* 130 N.W.2d 608, 615 (N.D.1964).

In *Skjonsby, supra,* a case decided after the amendments to section 28–32–02, N.D.C.C., became effective, we apparently gave some credence to administrative practice without proof of promulgation of a rule pursuant to section 28–32–02, N.D.C.C. *Skjonsby* is distinguishable, however, as the issue in *Skjonsby* was the transferability of a certificate of public convenience and necessity, a procedural matter. We upheld the Public Service Commission's interpretation of this procedural matter. The issue in the case at hand, however, involves a substantive rule as it arbitrarily sets a two-year limitation on rehabilitation training. If the amendments to the Administrative Agencies Practice Act commencing with the 1977 session of the legislature, which we have partially referred to, are to be effective, we can no longer give credence to administrative practice or policy that has not been adopted in compliance with the act.

The issue of compliance with section 28–32–02, N.D.C.C., was raised in *Johnson v. North Dakota Workers Compensation Bureau,* 428 N.W.2d 514, 518 (N.D.1988). In *Johnson* the Workmen's Compensation Bureau followed a rule or directive relating to the reimbursement of travel expenses in conjunction with medical treatment, both before 1977 and later with minor amendments, without complying with the Administrative Agencies Practice Act (Ch. 28–32, N.D.C.C.). We, in effect, without explicitly so holding, found that administrative practice (rule or directive) insufficient to justify noncompliance with the act under our construction of the 1977 amendments to the Administrative Agencies Practice Act.[11]

Although not helpful to us in determining the specific issue in this case, we think the conclusion drawn by one of the foremost authorities in this area of the law is significant and is something our legislature would understand and appreciate:

"It is too obvious for argument that rehabilitation, where possible, is the most satisfactory disposition of industrial injury cases, from the point of view of the insurer, employer and public as well as of the claimant. Apart from the incalculable gain to the worker himself, the cost to insurers and employers of permanent disability claims under a properly adjusted system is reduced; and, so far as the public is concerned, it has been said on good authority that for every dollar spent on rehabilitation by the Federal Government it has received back ten in the form of income taxes on the earnings of the persons rehabilitated. It is probably no exaggeration to say that in this field lies the greatest single opportunity for significant improvement in the benefits afforded by the workmen's compen-

---

rewording of a rule to meet objections as to legality." § 28–32–02, N.D.C.C.

**11.** At 1280 of the tape of the oral arguments in *Johnson,* the issue of the weight to be given long-established administrative agency practice was raised by Justice VandeWalle in his questions to counsel for the claimant. The practice (rule or directive) in *Johnson* covered a period of time commencing at least by 1966 and continuing until August of 1988.

sation system." 2 Larson, The Law of Workmen's Compensation § 61.25 (1989).

For the reasons stated herein, we affirm the judgment of the district court with costs on appeal to Smith.

LEVINE, J., concurs in the result.

MESCHKE, Justice, concurring and dissenting.

I join in much of Chief Justice Erickstad's opinion for the majority. The Bureau's determination, that a two-year program was sufficient to substantially rehabilitate Smith's earning capacity to his pre-injury level, was unreasonable and unsupported by evidence.

However, I believe that the Bureau's refusal to fairly consider paying Smith's expenses to relocate to another city to attend college for the desired rehabilitation was also arbitrary and unreasonable.

NDCC 65–05.1–05 authorizes the Bureau to contract to pay the "cost" of a rehabilitation program, to furnish the "equipment and tools" for the training, and. to pay weekly support to the claimant up to the "amount of weekly compensation and dependent benefits ... plus twenty-five percent" as spelled out in NDCC 65–05.1–06. A claimant's noncompliance with a contracted rehabilitation program relieves the Bureau from paying disability. NDCC 65–05.1–04. Similarly, as the Bureau's proposed Rehabilitation Contract in this case illustrates, "upon completion of the rehabilitation retraining program, the claimant will be deemed qualified for gainful employment within his chosen vocation." Thus, a rehabilitation contract ends the Bureau's responsibility for disability payments to the claimant for the injury. The goal of rehabilitation is to save the public pocketbook from a large, long-term disability cost by a smaller, short-term educational investment.

Surely, reasonable expenses of moving to a new place for rehabilitation are a part of the "cost" of the program. It is incomprehensible to me how an authorization for moving expenses after rehabilitation can become a limitation on moving expenses for rehabilitation. Considering the large saving to the Bureau from rehabilitation results, it is a "penny-wise and dollar foolish" act by the Bureau to insist that a disabled and strapped claimant foot the cost of moving to the rehabilitation program.

The Bureau's penurious position does not "ensur[e] ... services, so far as possible, necessary to assist the claimant and the claimant's family in the adjustments required by the injury" which the legislature directed in establishing the scheme of rehabilitation services. NDCC 65–05.1–01. The Bureau diminishes the "sure and certain relief" envisioned "for workers injured in hazardous employments, and for their families and dependents." NDCC 65–01–01. Unrealistically, the Bureau seeks savings by a claimant's sacrifices.

The Bureau's refusal to consider rehabilitation moving expenses for a distressed claimant and his family is intolerable and unreasonable. Therefore, I would also require the Bureau to fairly consider Smith's relocation expense. On that item, I respectfully dissent.

VANDE WALLE, Justice, dissenting and concurring.

I respectfully dissent.

The majority distinguishes *Levey v. N.D. Workers Compensation Bureau*, 425 N.W.2d 376 (N.D.1988), which upheld a Bureau decision to award vocational rehabilitation benefits for two years rather than four years because the "extent of pre-injury earning capacity to which a claimant is entitled to be restored was not raised by Levey in his brief or in the petition for rehearing" and was not addressed in that opinion. The issue may not have been presented in precisely the manner conceptualized by the majority opinion but *Levey* did observe that the Bureau normally awards only two years of vocational rehabilitation benefits; that Levey was informed prior to enrolling in a four-year program that the Bureau normally grants only two years of vocational-rehabilitation benefits; and that there are numerous two-year-degree programs for persons interested in mathematics and science which would

qualify a person for employment. I believe that *Levey* controls this case also and I disagree with the rationale employed by the majority to reach a desired result.

My major disagreement with the majority opinion involves its conclusion that under applicable law an applicant may be entitled to four years of vocational rehabilitation. The Bureau normally grants only two years of vocational rehabilitation. *Levey, supra.* Chapter 65–05.1 was, as the majority notes, enacted in 1975. The Bureau is charged with its administration and it has interpreted the Act as requiring only two years of vocational rehabilitation. The interpretation of an agency charged with the administration of an Act is entitled to weight in construing the Act. *Johnson v. Wells County Water Resource Bd.*, 410 N.W.2d 525 (N.D.1987). Furthermore, although it is not conclusive of the intent of the Legislature enacting the statutes, subsequent legislation, when it contains a clear sense of direction, may be considered in interpreting statutes. We can take that sense of direction in determining what legal concept or principal of law should be applied [*Jerry Harmon Motors v. Farmers U. Grain Term.*, 337 N.W.2d 427 (N.D. 1983)], and, absent anything contrary, it also indicates that the interpretation was in accord with earlier public policy [*Davis v. Auto-Owners Ins. Co.*, 420 N.W.2d 347 (N.D.1988)]. Thus we have considered subsequent amendments to a statute in ascertaining the legislative intent and purpose of a prior version of a statute. *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901 (N.D.1986).

Here, the "clear sense of direction" is unmistakably obvious. The 1989 Legislature amended Section 65–05.1–06.1(2)(b), N.D.C.C., to provide that the rehabilitation allowance must be limited to one hundred four weeks, except in cases of catastrophic injury which is defined therein, and Smith's injuries are not within that definition. That amendment comports exactly with the Bureau's interpretation of the 1975 enactment.

The majority opinion ignores these obvious indicia of legislative intent and relies on one sentence, taken out of context, from the drafter's notes to the bill which created the 1975 law, to wit: "The term 'comprehensive rehabilitation services' is the key to this bill. It is quite evident that the Bureau must supply more than simply vocational training in the area of rehabilitation." But that comment does not support the result reached by the majority. Rather, its obvious reference is to the last sentence of Section 65–05.1–01, prior to the 1989 amendment, which states that the services the claimant is to receive are to include "medical, psychological, economic, and social rehabilitation." It is thus apparent, as the drafter stated, that the Bureau must supply more than vocational training in the area of rehabilitation. It must also supply medical, psychological, and social rehabilitation.

The majority opinion imposes an entire standard which the Bureau would have to meet in rehabilitation cases, but for the 1989 legislation, which I believe was not required or even contemplated by the Legislature. I disagree with much of that standard. One of the most glaring deficiencies is the adoption by the majority of Smith's claim that the "accountants have a rule of thumb that considers anything above 10 percent to be material." The majority concludes that "absent a contrary suggestion from the Bureau, we will apply this '10 percent rule' and conclude that a claimant is substantially rehabilitated if he can be employed to within 10 percent of his pre-injury earning capacity." There is little in the record, other than Smith's claim that anything above 10 percent is material, to support his position. The majority opinion is a good example of what may happen when a court sets out to formulate the policies under which an agency endowed by the Legislature with certain functions is to operate. What the majority refers to as a "rule of thumb" on one page of the opinion becomes the "10 percent rule" on the next page!

Significantly, there is an inconsistency in ignoring the 1989 legislation limiting the period of education to two years and yet relying on the 1989 legislation amending Section 65–05.1–01(3) to conclude that the

rehabilitation is to return the disabled worker to substantial gainful employment as measured by the worker's average weekly earnings at the time of the injury. Those two provisions should be used together, as the Legislature intended, or not used at all. It is evident that if the two-year "cap" applied to exactly the factual situation represented in the record before us, Smith would not be entitled to four years of education even though the two years, according to the record as interpreted by the majority opinion, would not result in employment which produces Smith's average weekly earnings at the time of the injury. Section 65–05.1–01(3), upon which the majority relies, is a statement of objective and it provides for a goal which will return the worker "as nearly as possible to the worker's average weekly earnings at the time of injury, or to the average weekly wage in this state on the date the rehabilitation consultant's report is issued under section 65–05.1–02.1, whichever is less." However, under the same 1989 legislation the rehabilitation award is governed by Section 65–05.1–06.1(2)(c), which limits the allowance to 104 weeks, and there is no doubt that such specific limitation controls the other general objectives. Therefore, it is wrong to use the formula for calculating earning capacity as set forth in the 1989 legislation without also using the limitation that, too, is a part of the 1989 legislation. When two statutes relating to the same subject matter appear to be in conflict they should, whenever possible, be construed to give effect to both if that can be done without doing violence to either. *O'Fallon v. Pollard,* 427 N.W.2d 809 (N.D.1988). Here, the majority would violate the 104–week limitation.

Without the absolute limitation contained in the 1989 legislation there are two policies which may ultimately conflict, i.e., returning the employee to an earning capacity at least equivalent to what that employee earned prior to the injury while, at the same time, conserving the finite financial resources of the Bureau so that all eligible insured employees may receive benefits. Ordinarily an agency's interpretation of the statute which represents a reasonable accommodation of conflicting policies should not be disturbed by the courts. *Heart v. Ellenbecker,* 689 F.Supp. 988 (D.S.D.1988). We should apply that rule of restraint in this instance.

It is also inconsistent to observe that the conclusions drawn by Huss, the expert for the Bureau, are not properly before us for review but to draw inferences from selected conclusions which appear to support the result desired by the majority opinion and to ignore that evidence which would lead to the opposite result.

Finally, I must note that the Bureau, by its framing of its findings and conclusions, appears to have invited the very quest in which the majority has engaged. If the issue were solely whether or not Smith was going to be able to earn the same wage after a two-year rehabilitation program in accounting as he earned prior to his injury, I agree with the majority that the evidence indicates he would not. In that respect I agree that the finding of the Bureau that the "Claimant's earning capacity following a 2 year vocational rehabilitation is substantially equivalent to, or higher than claimant's pre-injury earnings capacity where he earned an average of $14,300.00 per year from 1974 through 1983" is not supported by the evidence and the conclusion that this two-year program is sufficient to rehabilitate his earning capacity to his pre-injury earning capacity is therefore incorrect. However, I do not believe this is, as the majority opinion appears to assume, the only standard. I believe the standard is, as stated elsewhere in the findings and conclusions of the Bureau, whether, considering the two-year limitation on rehabilitation, this program is sufficient for Smith to obtain salable and transferable skills for a return to employment which will, considering the limitation, give him a wage which restores as nearly as possible under the circumstances his average weekly earnings at the time of the injury. The Bureau in its findings and conclusions observed that Smith could be rehabilitated through various two-year vocational rehabilitation programs, some of which would provide the same levels of income as he

received prior to his injury and that the further an individual pursues vocational rehabilitation retraining the higher his earning capacity will be. It also observed that Smith made his vocational choice of his own volition, as he should be entitled to do. These findings and conclusions are unassailable and I would reverse the judgment of the district court and affirm the decision of the Bureau.

I concur in that portion of the majority opinion which concludes that Smith is not entitled to reimbursement for the expenses he incurred in relocating to Valley City to attend college.

GIERKE, J., concurs.