1997 SD 66

**Roger KURTENBACH, Employee, Claimant and Appellee,**

v.

**FRITO–LAY, Employer, Defendant and Appellant,**

**and**

**Planet Insurance, Insurer, Defendant and Appellant.**

Nos. 19579, 19582.

Supreme Court of South Dakota.

Considered on Briefs Dec. 3, 1996.

Reassigned April 11, 1997.

Decided June 4, 1997.

871

Thomas E. Simmons of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for Employee, Claimant and Appellee.

Lori Purcell Fossen and Susan Jansa Brunick of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for Appellants.

MILLER, Chief Justice (on reassignment).

[¶ 1.] Employer appeals Department of Labor's award of rehabilitation benefits to Claimant for a five and one-half year collegiate metallurgical engineering program. By notice of review, Claimant appeals the circuit court's denial of benefits during the time prior to petitioning the Department of Labor for rehabilitation benefits as well as the denial of *Cozine* benefits. We reverse in part and remand in part.

### FACTS

[¶ 2.] Roger Kurtenbach was employed as a route salesperson with Frito–Lay (Employer) for approximately thirteen years when he suffered a work-related back injury in August of 1991. At the time of the injury, he was earning nearly $40,000 per year. Following surgery and physical therapy, he attempted to return to work but was unable to perform his normal duties. The parties do not dispute that Kurtenbach's injury prevented him from returning to his position as a route salesperson for Employer.

[¶ 3.] On January 13, 1993, Kurtenbach enrolled in a civil engineering program at South Dakota School of Mines & Technology (SDSM & T). He later changed his major to metallurgical engineering.[1] He did not con-

---

1. Metallurgical engineering concerns "the extraction of metals from their ores, refining them, and preparing them for use and includes processes (as alloying, rolling, and heat-treating)

tact Employer about receiving rehabilitation benefits until January 23, 1993, after his enrollment in the program. Kurtenbach's claim was denied by Employer, prompting Kurtenbach to petition the Department of Labor (Department) for rehabilitation benefits.

[¶ 4.] Following a February 9, 1995, hearing, Department concluded that the five and one-half year metallurgical engineering program was a necessary and reasonable means of restoring Kurtenbach to suitable employment and that he was entitled to rehabilitation benefits for the duration of the program. Department also held that his petition for rehabilitation benefits was timely filed, but denied his request for *Cozine* benefits.

[¶ 5.] Employer appealed to the circuit court. Department's decision was affirmed in its entirety except the circuit court reversed the award of benefits for the period between Kurtenbach's enrollment at SDSM & T in January, 1993, and his petition to Department in August, 1993. This appeal followed.

## STANDARD OF REVIEW

[¶ 6.] Our review of administrative appeals is well-settled:

> We will overrule an agency's findings of fact only when they are clearly erroneous. The question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding. In other words, even if there is evidence in the record which tends to contradict the Department's factual determination, so long as there is some substantial evidence in the record which supports the Department's determination, this court will affirm. Great weight is given to the findings made and inferences drawn by an agency on questions of fact. Conclusions of law are given no deference and are fully reviewable. When reviewing evidence presented by deposition, we do not apply the clearly erroneous standard but review that

testimony as though presented here for the first time.

*Hendrix v. Graham Tire Co.*, 520 N.W.2d 876, 879 (S.D.1994) (citations and internal quotations omitted). We review an administrative agency's decision without any presumption that the circuit court's decision was correct. *Nilson v. Clay County*, 534 N.W.2d 598, 600 (S.D.1995).

[¶ 7.] **I.  Whether the award of rehabilitation benefits was clearly erroneous.**

[¶ 8.] The workers' compensation statutes allow a claimant to receive compensation during rehabilitation:

> If an employee suffers disablement as defined by subdivision 62–8–1(3) or an injury and is unable to return to his usual and customary line of employment, the employee shall receive compensation at the rate provided by § 62–4–3 up to sixty days from the finding of an ascertainable loss if the employee is actively preparing to engage in a program of rehabilitation. Moreover, once such employee is engaged in a program of rehabilitation which is reasonably necessary to restore the employee to suitable, substantial and gainful employment, the employee shall receive compensation at the rate provided by § 62–4–3 during the entire period that he is engaged in such program. The employee shall file a claim with his employer requesting such compensation and the employer shall follow the procedure specified in chapter 62–6 for the reporting of injuries when handling such claim. If the claim is denied, the employee may petition for a hearing before the department.

SDCL 62–4–5.1.[2]

[¶ 9.] We have interpreted this statute on numerous occasions and established a five-part test for awarding rehabilitation benefits:

1.  The employee must be unable to return to his usual and customary line of employment;

---

and the study of the structure and properties of metals." *Webster's Third Int'l Dictionary* 1420 (1976).

**2.**  This statute was amended in 1994. This amendment does not apply to Kurtenbach's claim for rehabilitation benefits.

2. Rehabilitation must be necessary to restore the employee to suitable, substantial, and gainful employment;

3. The program of rehabilitation must be a reasonable means of restoring the employee to employment;

4. The employee must file a claim with his employer requesting the benefits; and

5. The employee must actually pursue the reasonable program of rehabilitation.

*Hendrix*, 520 N.W.2d at 883; *Chiolis v. Lage Dev. Co.*, 512 N.W.2d 158, 160 (S.D.1994); *Beckman v. John Morrell & Co.*, 462 N.W.2d 505, 507 (S.D.1990); *Cozine v. Midwest Coast Transp., Inc.*, 454 N.W.2d 548, 553 (S.D. 1990).

[¶ 10.] *1. Whether Kurtenbach was unable to return to his usual and customary line of employment.*

■ [¶ 11.] The first requirement, Kurtenbach's inability to return to "his usual and customary line of employment," is unquestioned. His duties with employer included lifting and repetitive motion, tasks he was no longer capable of performing.

[¶ 12.] *2. Whether rehabilitation is necessary to restore Kurtenbach to suitable, substantial, and gainful employment.*

■ [¶ 13.] The second requirement, whether rehabilitation is necessary, is disputed by Employer. It argues that Kurtenbach's position was primarily a "sales" job, and that retraining is unnecessary because there are sales jobs available which would restore him to "suitable, substantial, and gainful employment." Kurtenbach maintains that his personality is not suited for the type of sales jobs Employer suggests, and that his job with Employer was not primarily sales-oriented, but limited to servicing and maintaining existing accounts. His vocational expert, William Peniston, agreed that sales only accounted for a minor percentage of Kurtenbach's daily duties and further noted that he was "financially unsuccessful" in previous straight-commission sales positions.

[¶ 14.] The jobs suggested by Employer's vocational expert, Ronald Ochs, were straight-commission positions involving the sale of automobiles, vacuum cleaners, and insurance. Ochs conceded at the Department hearing, and in his "Labor Market Survey," that these positions had a high turnover rate and a dismal success rate. He also testified that only "good" salespeople could be expected to earn at a level comparable to Kurtenbach's earnings with Employer.

■ [¶ 15.] " 'The statute requires more than mere restoration to employment. The new employment must be suitable when compared to the employee's former job.' " *Chiolis*, 512 N.W.2d at 160 (quoting *Cozine*, 454 N.W.2d at 554). We agree with Department that commission sales positions would not return Kurtenbach to suitable, substantial, or gainful employment:

We must distinguish between Claimant's position with Frito–Lay and the employment suggested by Employer/Insurer. As a Frito–Lay route salesman, Claimant did not have to establish his customer base, but rather, he took over an existing route. It is true that the driver on these routes must service the customers on his route. This consists of being sure the customer's shelves and displays are well stocked, and that the customer is prepared for his sales. While it is true that the driver encourages the customer to add special displays, this cannot be compared to salesmanship required of a successful auto dealer. One has a captive audience and the other captures. One knows the product and wants to have it available to his consumer. The other must convince the ultimate buyer of the value of the product.

*Kurtenbach v. Frito–Lay*, SD Dep't of Labor, Div. of Labor & Management, HF No. 36, 1993/94 (June 1995).

[¶ 16.] Department also pointed out that Peniston did not find Kurtenbach to be suited for commission sales and that his presentation at the hearing proved that he simply did not have the personality traits of an aggressive salesperson. " '[T]he agency, after holding a hearing and listening to witnesses, is in a much better position to find facts than are we on appeal.' " *Cox v. Sioux Falls Sch. Dist. No. 49–5*, 514 N.W.2d 868, 873 (S.D.1994) (quoting *Permann v. South Dakota Dep't of Labor*, 411 N.W.2d 113, 117

(S.D.1987)); *accord Abild v. Gateway 2000, Inc.,* 1996 SD 50, ¶ 9, 547 N.W.2d 556, 559.

[¶ 17.] According to *Cozine,* before the burden of establishing the existence of suitable employment shifts to the employer, the employee must make a prima facie showing that he is unable to find suitable employment. 454 N.W.2d at 554. Employer claims that one day of telephone calls to inquire about the commission sales jobs, after enrolling at SDSM & T, does not constitute a valid job search. Department stated that ordinarily a job search is critical to establishing a right to rehabilitation benefits, but it is not necessary where a search would be fruitless because the proposed employment "is beyond the individual in terms of success."

[¶ 18.] In *Chiolis,* we noted that the claimant's less than aggressive job search was excusable where the experts agreed he needed retraining. 512 N.W.2d at 160. Evidence was presented at the Department hearing which shows the experts believed Kurtenbach needed vocational retraining. His neurosurgeon, Dr. James, recommended vocational retraining in March and April of 1992. Even so, Kurtenbach made an unsuccessful attempt to return to work in April. Dr. Anderson suggested retraining after examining him on June 24, 1992, on a referral from the South Dakota Department of Vocational Rehabilitation. After examining him in November, 1992, Dr. Goff, a physiatrist, stated he should not return to his previous job. Peniston concluded that retraining was necessary to restore him to suitable, substantial, and gainful employment. Finally, even Employer's expert stated, "[S]ome type of retraining may be in order[.]"

[¶ 19.] Ochs testified that the goal in finding suitable employment is a position offering seventy-five to eighty percent of the pre-injury wage. Employer did not meet its burden in establishing the existence of suitable, substantial, and gainful employment without rehabilitation "because it did not present any potential employers who were willing to pay seventy-five to eighty percent of [Kurtenbach's] prior wage.... Therefore, finding that rehabilitation was necessary to restore [Kurtenbach] to suitable, substantial and gainful employment was cor-

rect." *Chiolis,* 512 N.W.2d at 160 (citation omitted). In light of all of the above and our review of the record, Department was not clearly erroneous in finding that Kurtenbach met his burden in showing that rehabilitation was necessary to restore him to suitable, substantial and gainful employment.

[¶ 20.] *3. Whether the program of rehabilitation is a reasonable means of restoring Kurtenbach to employment.*

[¶ 21.] Employer disputes the reasonableness of Kurtenbach's five and one-half year metallurgical engineering program, claiming the program chosen by Kurtenbach will not restore him to suitable, substantial, and gainful employment because no employment opportunities in that field exist in Kurtenbach's community. Kurtenbach contends that his willingness to relocate and the record evidence establishing at least twenty-one metallurgical engineering opportunities nationwide make his chosen rehabilitation program reasonable.

[¶ 22.] The purpose of rehabilitation benefits is to restore an injured employee to suitable, substantial, and gainful employment. *Hendrix,* 520 N.W.2d at 883; *Chiolis,* 512 N.W.2d at 161; *Beckman,* 462 N.W.2d at 508; *Cozine,* 454 N.W.2d at 554. A program of rehabilitation which does not accomplish this purpose is not reasonable. *See Barkdull v. Homestake Mining Co.,* 411 N.W.2d 408, 410 (S.D.1987). The claimant bears the burden of establishing the reasonableness of a program of rehabilitation. *Chiolis,* 512 N.W.2d at 161.

[¶ 23.] A determination of whether a program of rehabilitation is reasonable necessarily requires an evaluation of the employment prospects for the claimant upon completion of the program. *See* Jane M. Draper, *Workers' Compensation: Vocational Rehabilitation Statutes,* 67 A.L.R.4th 612, 628–29 (1989). Employment prospects and the availability of suitable, substantial and gainful employment are evaluated in light of the claimant's community. *Bonnett v. Custer Lumber Corp.,* 528 N.W.2d 393, 395 (S.D. 1995); *Hendrix,* 520 N.W.2d at 883; *Petersen v. Hinky Dinky,* 515 N.W.2d 226, 231 (S.D.1994); *Shepherd v. Moorman Mfr'g,* 467

N.W.2d 916, 920 (S.D.1991); *Rank v. Lindblom*, 459 N.W.2d 247, 249 (S.D.1990). An employer cannot rely on employment opportunities which would unreasonably require a claimant to relocate in order to defeat a claim for rehabilitation benefits. *See Rank*, 459 N.W.2d at 249. "The test is more restrictive. The focus is on employment in the community where the claimant is already residing." *Id.* Similarly, a claimant is not entitled to use job opportunities outside his community to establish the reasonableness of a program of rehabilitation. Both employer and claimant are confined to the claimant's community for purposes of establishing whether a program is reasonable.

[¶ 24.] Kurtenbach contends his program of rehabilitation is reasonable because it restores him to at least 75% of his pre-injury wage of $40,000 per year. Kurtenbach, however, has not shown that the metallurgical engineering program will restore him to suitable employment *in his community*.[3] His own expert, Peniston, stated there was no information concerning the availability of employment opportunities in Kurtenbach's community upon completion of the program. Peniston stated: "I'm assuming he's probably going to have to relocate after he retrains." The record indicates as few as twenty-one jobs exist for metallurgical engineers nationwide, none of which are located in Kurtenbach's community.[4] The program of rehabil-

itation Kurtenbach chose to pursue does not restore him to suitable employment in his community, or even in this state, and his willingness to relocate does not change this.[5]

[¶ 25.] A claimant may enroll in a rehabilitation program without the consent of the employer, but he does so at his own risk; that is, rehabilitation benefits will not be guaranteed for a particular program simply because the program is one a claimant wishes to pursue. The five requirements for rehabilitation benefits must be met before benefits will be awarded for a program of rehabilitation. *Hendrix*, 520 N.W.2d at 883. The highly specialized program of rehabilitation unilaterally selected by Kurtenbach does not restore him to suitable, substantial and gainful employment in his community. Rather, the program improperly elevates Kurtenbach's station in life at the expense of Employer. *See Chiolis*, 512 N.W.2d at 161; *Barkdull*, 411 N.W.2d at 410. His chosen metallurgical engineering specialty program is not reasonable. Because the program does not meet all the requirements for rehabilitation benefits, Department's award of rehabilitation benefits is reversed.

[¶ 26.] Our reversal of Department's award of rehabilitation benefits for Kurtenbach's metallurgical engineering program should not be construed as a complete denial of rehabilitation benefits. Kurtenbach is free to propose a different program of rehabilita-

---

3. We respectfully submit the minority has misread our holding in this regard. We are not requiring that a claimant must prove an *actual* suitable employment opportunity, but rather that suitable employment must be available in a claimant's community. This requirement is supported by our line of cases in this area. *Bonnett v. Custer Lumber Corp.*, 528 N.W.2d 393, 395 (S.D.1995); *Hendrix v. Graham Tire Co.*, 520 N.W.2d 876, 883 (S.D.1994); *Shepherd v. Moorman Mfr'g.*, 467 N.W.2d 916, 920 (S.D.1991); *Rank v. Lindblom*, 459 N.W.2d 247, 249 (S.D. 1990).

4. The minority makes much of the fourteen entities in the Black Hills area which reportedly hire engineers according to information from the South Dakota Department of Environment & Natural Resources. This report and the statistics relied on by the minority are not part of the settled record presented for our review. It is not an appropriate function of the judiciary to advance an argument on behalf of a party who has overlooked evidence or failed to meet his burden.

The minority inappropriately supplements the record where Kurtenbach has failed in order to achieve a desired result. *See Wooster v. Wooster*, 399 N.W.2d 330, 332 (S.D.1987) (noting judicial review is limited to the record and matters appropriate for judicial notice).

5. The minority contends Kurtenbach "*never* asserted a desire, a 'willingness,' or a need to leave the Black Hills to secure employment." This statement is not supported by the record. Department specifically noted "Kurtenbach has voiced *no objection to relocation.*" Kurtenbach's experts assumed relocation was required and testified as to the availability of employment opportunities for metallurgical engineers based on relocation. Additionally, the only employment statistics presented by Kurtenbach were for nationwide opportunities, none of which were located in South Dakota. Clearly, Kurtenbach was not opposed to relocation and, in fact, advocated relocation through the evidence he presented to Department.

tion. If the program meets the five requirements, he is entitled to receive rehabilitation benefits. *See Hendrix,* 520 N.W.2d at 883.

[¶ 27.] The denial of rehabilitation benefits for the metallurgical engineering program is dispositive of whether Kurtenbach's claim for the benefits was defeated by enrolling before petitioning the Department.

### [¶ 28.] II. Whether Kurtenbach is entitled to *Cozine* benefits.

[¶ 29.] Kurtenbach raised, by notice of review, the issue of whether Department erred by not awarding him *Cozine* benefits. *Cozine* benefits are those which are paid to a claimant for the loss of a part of the body or its loss of use. *See Cozine,* 454 N.W.2d at 551–52; SDCL 62–4–6. It is the responsibility of Department to determine a claimant's loss of use. *Tischler v. UPS,* 1996 SD 98, ¶ 53, 552 N.W.2d 597, 607; SDCL 62–4–6. "SDCL 62–4–6 specifies the amount of compensation an employee shall receive for the loss of a part of the body or its loss of use. The clear language of this statute directs that compensation shall be paid for loss of use. Consequently, the hearing examiner must determine if, and to what extent, a claimant has suffered the loss of use of a part of the body." *Cozine,* 454 N.W.2d at 551–52.

[¶ 30.] Kurtenbach claims Department erred in denying his request for *Cozine* benefits in addition to rehabilitation benefits. We have concluded Department's award of benefits for the metallurgical engineering program was in error. The record, however, is void of any indication that Department ever assigned Kurtenbach a loss-of-use disability rating. Department is required to assign him a loss-of-use rating, and has not properly fulfilled its statutory duty. SDCL 62–4–6. Therefore, we remand for a determination of Kurtenbach's loss of use.

[¶ 31.] We reverse Department's award of rehabilitation benefits for the metallurgical engineering program and remand for a determination of Kurtenbach's loss-of-use disability rating and consideration of any program of rehabilitation which Kurtenbach might propose.

[¶ 32.] AMUNDSON and GILBERTSON, JJ., concur.

[¶ 33.] SABERS and KONENKAMP, JJ., dissent in part and concur in part.

[¶ 34.] SABERS, J., dissents in part and concurs in part.

SABERS, Justice (dissenting in part and concurring in part).

[¶ 35.] I dissent on Issue 1 as the majority's conclusion is unsupported by the record, precedent, or logic. I would reach the merits on Issue 3 and determine that a claimant need not petition the Department prior to enrolling in a rehabilitation program. I agree that we should remand on Issue 2.

### [¶ 36.] 1. THE AWARD OF REHABILITATION BENEFITS WAS NOT CLEARLY ERRONEOUS.

[¶ 37.] This case presents an unusual situation where an employee with little experience and limited education was able to earn almost $40,000. The Department held that Kurtenbach's successful completion of the engineering program at SDSM & T will not elevate his station in life, but "rather will simply restore him to suitable, substantial and gainful employment, especially considering Claimant's [prior] earning level of approximately $40,000 per year." Our task on appeal is to determine whether there is substantial evidence in the record to support the agency's decision, *Hendrix v. Graham Tire Co.,* 520 N.W.2d 876, 879 (S.D.1994), not to find reasons to reverse, even if we would not have made a similar decision. *Fenner v. Trimac Transp., Inc.,* 1996 SD 121, ¶ 15, 554 N.W.2d 485, 489 (citing *Peterson v. Beck,* 537 N.W.2d 375, 379 (S.D.1995)); *accord Cox v. Sioux Falls Sch. Dist. No. 49–5,* 514 N.W.2d 868, 876 (S.D.1994) (Miller, C.J., dissenting) ("It appears to me that Department and the majority are improperly searching for reasons to reverse the Board."). The majority opinion disregards and damages the well-settled principle that workers' compensation statutes are liberally construed in favor of the injured employee:

It is long-standing public policy that worker's compensation statutes be liberally

construed in favor of injured employees. *S.D. Med. Service v. Minn. Mut. Fire & Cas. Co.*, 303 N.W.2d 358 (S.D.1981). Worker's compensation statutes are "remedial, and should be liberally construed to effectuate [their] purpose." *Moody v. L.W. Tyler, Custom Combiners*, 297 N.W.2d 179, 180 (S.D.1980).

*Mills v. Spink Elec. Coop.*, 442 N.W.2d 243, 246 (S.D.1989); *accord Great West Cas. Co. v. Bergeson*, 1996 SD 73, ¶ 6, 550 N.W.2d 418, 419–20; *Nilson v. Clay County*, 534 N.W.2d 598, 601 (S.D.1995); *Welch v. Automotive Co.*, 528 N.W.2d 406, 409 (S.D.1995).

[¶ 38.] Evidence at the Department hearing showed that the average yearly salary offered to a newly graduated metallurgical engineer was $35,000. This statistic was provided through the January 1995 "*CPC Salary Survey*," a publication of the College Placement Council (CPC), which compiles starting salary offers provided by 365 career placement offices of various colleges and universities. Employer and the majority opinion make much of the fact CPC reported only 21 offers made in the metallurgical engineering field from September 1, 1994 to August 31, 1995; Employer states these were the only offers in the entire nation. That may or may not be true—the disclaimer in *CPC* provides:

> The offers reported in the *Survey* are a representative sample of actual job offers made to new college graduates during the recruiting year and do not imply all job offers made to all college graduates.... In those categories where offers are relatively few, the data should be regarded only as indicative. (Emphasis in original).

6. In fact, the *CPC* does not release information regarding the college, the employer, or the individual offered the job; therefore, despite the majority opinion's contrary interpretation of the report, it is impossible to tell where these offers were made. Clearly, Kurtenbach did not "advocate relocation" through this evidence. Copies of the relevant sections of the *CPC* are reproduced and attached to this dissent to allow the reader to view the evidence objectively.

7. I concede that it would not be necessary to emphasize such readily ascertainable facts if the majority were applying the correct standard of review. In any event, that there are gold and other mining operations in the Black Hills which hire engineers can not reasonably be disputed

Furthermore, the *CPC* statistics do not include any geographical data concerning the job offers, so the majority statement that "the only employment statistics presented by Kurtenbach were for nationwide opportunities, none of which were located in South Dakota" (*supra* at note 5) finds no support in this record.[6]

[¶ 39.] Employer's own vocational expert, Ronald Ochs, testified that he learned from SDSM & T there would be employment available for metallurgical engineers in gold mines. Ochs' testimony did not specifically mention the gold mines in the Black Hills, but it is difficult to fathom what other gold mines to which he may have been referring. The South Dakota Department of Environment & Natural Resources, Division of Environmental Services, Minerals & Mining Program reports that there are at least fourteen entities which do business in the Black Hills as gold, limestone, and gravel mining companies and which hire engineers. This includes the Department of Transportation and excludes "mom and pop" operations.[7]

[¶ 40.] Kurtenbach's burden is to show that his rehabilitation program is reasonable by proving that it will restore him to "suitable, substantial, and gainful employment." *Hendrix*, 520 N.W.2d at 883; *Chiolis v. Lage Dev. Co.*, 512 N.W.2d 158, 160 (S.D.1994); *Beckman v. John Morrell & Co.*, 462 N.W.2d 505, 507 (S.D.1990); *Cozine v. Midwest Coast Transp., Inc.*, 454 N.W.2d 548, 553 (S.D. 1990). This is achieved by demonstrating that the program will enable the claimant to earn a salary roughly equivalent to seventy-five to eighty percent of his pre-injury salary. *Chiolis*, 512 N.W.2d at 160. Testimony

and are the type of facts properly subject to judicial notice. *See SDCL 19–10–2* (FedREvid 201(b)):

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

*See also Poppen v. Walker*, 520 N.W.2d 238, 246 (S.D.1994) ("We may take judicial notice of historical facts which are matters of general knowledge and specially those peculiarly connected with or affecting the state.").

showed that the salaries listed in *CPC* were approximately equal to starting salaries in South Dakota in the private sector ($29,000–$30,000); a state agency would pay a little less, with a starting salary of around $26,000–$27,000. The placement rate for SDSM & T graduates is 90%, with 80% becoming employed and 10% being accepted for postgraduate studies.

[¶ 41.] In this case, the majority suddenly announces a new standard where the claimant also must prove the program will "actually restore" him to work in his community. This is in direct contravention with our line of cases in this area, where we have always focused on whether claimants are *capable* of realizing nearly the same pre-injury level of pay, not how may job offers they might receive. *See, e.g., Hendrix*, 520 N.W.2d at 881 (addressing whether employment at a comparable wage was available to claimant); *Chiolis*, 512 N.W.2d at 161 (weighing a two-year program against a four-year program and concluding that a four-year was unnecessary because claimant could realize pre-injury wages via the two-year program). When Kurtenbach offered the *CPC* statistics, his purpose was to prove salaries in the engineering field; Employer and the majority seized on the *reported* 21 offers—ignoring the disclaimer (*see* ¶ 38 & attachment)—and thus put this matter at issue; however, when Employer advocated the two-year program, no evidence was offered to show how many job offers Kurtenbach could hope to receive after graduation from vocational school. In

any event, I do not fault the Department and the circuit court for not demanding this information, given that this will be the first time this court has done so.

[¶ 42.] Kurtenbach met his burden by presenting evidence of 1) a 90% placement rate and 2) regional salaries ranging from $26,000 to $30,000. Therefore, his rehabilitation program will enable him to secure employment at 65% to 75% of his pre-injury salary. As noted, the goal is 75% to 80%. Thus, it defies logic for the majority to state "the program improperly elevates Kurtenbach's station in life at the expense of Employer." ¶ 25, *supra.* Approving rehabilitation benefits to enable Kurtenbach to go from Frito-Lay route salesperson to metallurgical engineer does *not* elevate his station in life. Our cases disapproving rehabilitation benefits because they would "elevate [a claimant's] station in life" refer to programs which would result in a subsequent increase in *wage*, not a more flattering or more prestigious *title*. *See, e.g., Chiolis*, 512 N.W.2d at 161; *Cozine*, 454 N.W.2d at 554; *Barkdull v. Homestake Mining Co.*, 411 N.W.2d 408, 410 (S.D.1987) (*Barkdull II* ).[8] Here, Kurtenbach will actually realize a substantial drop in wages, making it preposterous to conclude his station in life is elevated.

[¶ 43.] The majority opinion states that Kurtenbach's "willingness to relocate" does not meet the test for achieving suitable employment. This statement is curious, as it

---

8. Moreover, such shifts in occupation are not unprecedented under workers' compensation rehabilitation statutes. *See, e.g., Beckman*, 462 N.W.2d at 508–09 (from shackling cattle and boning hams to a printing technology course); *Ranger Ins. Co. v. Speck*, 145 Ga.App. 327, 243 S.E.2d 593, 594 (1978) (from police officer to degree program enabling a career in accounting or bookkeeping); *Wilson v. Crown Cork & Seal*, 503 N.W.2d 472, 475 (Minn.1993) (from manual labor production worker to four-year program in accounting); *Gilmore v. Little Jack's Steak House*, 292 N.W.2d 14, 15 (Minn.1980) (from bartender to program in accounting and business administration); *Norby v. Arctic Enter. Inc.*, 305 Minn. 519, 232 N.W.2d 773, 774–75 (1975) (from small engine mechanic to program in accounting); *Behrens v. Ken Corp.*, 191 Neb. 625, 216 N.W.2d 733, 734–35 (1974) (from motel maid to secretarial training); *Smith v. North Dak. Workers Comp. Bureau*, 447 N.W.2d 250, 251 & 259 (N.D.1989) (from winch truck driver to accounting program); *Solo Cup Co. v. Brown*, 660 P.2d 655, 658 (Okla.Ct.App.1983) (from forklift operator to jewelry making course); *Massachusetts Bonding & Ins. Co. v. Industrial Comm'n*, 275 Wis. 505, 82 N.W.2d 191, 192–93 (1957) (from pilot to social work program); *see also Beloit Corp. v. State, Labor & Indus. Review Comm'n*, 152 Wis.2d 579, 449 N.W.2d 299 (Wis.Ct.App.), *review denied*, 451 N.W.2d 297 (Wis.1989) (awarding rehabilitation benefits for five-year mechanical engineering program to claimant who was 19 years old and only employed for one month at time of injury); *cf. Wilson*, 503 N.W.2d at 475 ("Rehabilitation efforts leading to a job with a higher economic status than would have occurred without the disability is permitted if it can be demonstrated that this rehabilitation is necessary to increase the likelihood of reemployment.") (citation & internal quotation omitted).

has no support in the record. Kurtenbach has *never* asserted a desire, a "willingness," or a need to leave the Black Hills to secure employment. On the contrary, he offered testimony to show what the starting salaries for engineers were in South Dakota, both in the private sector and in government employment.

[¶ 44.] As noted above, this is an unusual situation where a person with very little post-secondary education was able to make nearly $40,000 per year. While I think there is substantial evidence in the record to support the Department's decision, we should at least give Kurtenbach the opportunity to show whether his program will "actually restore" him to suitable employment in his community. According to our prior decisions, he did not have notice before now that this is the standard he must meet. *See supra* ¶ 24. In fact, in at least one prior case, this court denied a claimant rehabilitation benefits because his employer demonstrated that employment was available *throughout the state. See Barkdull II*, 411 N.W.2d at 410.

[¶ 45.] If the court adopts this new standard, then we have not been provided with an adequate basis from which to make an informed decision.[9] We do not know whether Kurtenbach limited his opportunities by switching the focus of his program to metallurgical engineering. Will he be qualified to accept positions as a civil or other type of engineer? Are the gold mine jobs to which Ochs referred located in the Black Hills? Were any of the reported 21 offers made in the metallurgical engineering field extended for jobs in the Black Hills community? Without this information, it is difficult, under the majority opinion, to make a final determination whether Kurtenbach chose a reasonable means of restoring himself to suitable, substantial, and gainful employment. This issue can not be resolved absent additional information concerning these disputed facts.

Therefore, we should remand issue 1 for more fact-finding regarding Kurtenbach's regional employment opportunities upon graduation.[10]

[¶ 46.] **2. I AGREE WE SHOULD REMAND ON ISSUE 2**

[¶ 47.] **3. KURTENBACH'S CLAIM WAS NOT DEFEATED BY ENROLLING BEFORE PETITIONING THE DEPARTMENT**

[¶ 48.] Employer argues that Kurtenbach is completely barred from receiving rehabilitation benefits because he did not petition the Department for a hearing before he enrolled in the engineering program. The Department held that his petition was timely filed. Judge Zinter modified that holding to omit benefits owed from the time of enrollment to the time of petition. Kurtenbach appeals that holding by notice of review. Employer relies entirely on *Chiolis* for its position, which requires a review of that decision, specifically, the following statement:

Chiolis started his current college program before petitioning Department for rehabilitation benefits. Even recognizing that the primary purpose of rehabilitation benefits is to restore the injured employee to substantial and gainful employment, the worker may not unilaterally decide what training he or she may want to pursue and proceed to do so at the employer's expense. *Murdock v. MBPXL Corp.*, 12 Kan.App.2d 312, 742 P.2d 441, 446 (1987). "To approve such an independent approach to rehabilitation training by a claimant would result in untold administrative and economic chaos and a total breakdown of the legislatively intended benefits to the injured worker of rehabilitation training." *Id.* "While such self-improvement is highly laudable, particularly in view of the claimant's independent quest for it, unaided by the employer or carrier, it is outside the

---

9. In fairness to counsel, the hearing examiner, and the circuit court judge, they evidently relied upon testimony regarding regional salaries and did not inquire into the number of potential job offers.

10. Since the case is being remanded on Issue 3, it makes sense to resolve Issue 1 on remand as

well. This would comport with principles of judicial economy and efficiency. It is unreasonable for the majority to invite Kurtenbach to propose a different program of rehabilitation when he has only a year and a half left on his current program.

range of benefits" provided by South Dakota law. *City of Salem v. Colegrove*, 228 Va. 290, 321 S.E.2d 654, 656 (1984). To approve a procedure which allows an injured employee to select a rehabilitation program before petitioning Department or reaching an agreement with the employer would be putting the cart before the horse. *Chiolis*, 512 N.W.2d at 161–62. First, this statement can be characterized as dictum because Chiolis was denied benefits, not because he enrolled prior to petitioning the Department but because he failed in his burden to show that a four-year degree program was necessary to return him to substantial, gainful employment. Fatal to the claimant in *Chiolis* was that a four-year program would go beyond restoring him to a pre-injury wage by elevating his station in life at the expense of his employer. *Id.* at 161.

[¶ 49.] Next, neither the statute nor our cases interpreting it establish a requirement that the Department must be petitioned before a claimant pursues a rehabilitation program. In fact, one cannot receive benefits until "such employee *is engaged* in a program of rehabilitation[.]" SDCL 62–4–5.1 (emphasis added). *See also Hendrix*, 520 N.W.2d at 883; *Chiolis*, 512 N.W.2d at 160; *Beckman*, 462 N.W.2d at 507; *Cozine*, 454 N.W.2d at 553 (unanimously listing only the previously discussed five requirements, reproduced *supra* at ¶ 9). Nowhere before or since *Chiolis* did we suggest that a petition to the Department was a prerequisite. The only mandatory language in the statute pertains to filing a claim with the employer, while providing that the claimant "may" petition the Department upon denial of its claim to the employer. SDCL 62–4–5.1.

[¶ 50.] Furthermore, the cases cited in *Chiolis* in apparent support of this proposition are not on point. *See Murdock*, 742 P.2d at 445–46 (denying rehabilitation benefits when claimant entered a medical assistant program even though 1) she was informed she was medically unsuitable for that program because of her injury; 2) she was acting without approval from her vocational counselors; 3) she was acting against court order). *Murdock* clearly does not stand for the proposition a claimant may not receive rehabilitation benefits simply because she enrolled in the program without petitioning the Department. *See also Colegrove*, 321 S.E.2d at 656 (holding that Virginia workers' compensation statutes *never* encompass a four-year college degree program as a reasonable and necessary rehabilitation program). *Colegrove* directly contradicts another statement in *Chiolis*: "We are not implying that a four-year college degree can never be a reasonable means of rehabilitation." 512 N.W.2d at 161.

[¶ 51.] A more common-sense approach is that claimants may enroll in retraining programs at their own risk; that is, rehabilitation benefits will not be guaranteed for that particular program simply because that is the one the claimant wishes to pursue.[11] The five requirements discussed above must still be met before rehabilitation benefits will be paid out. "It is [Kurtenbach's] right to seek a college education, but [Employer] cannot be compelled to pay for such a program if it is not necessary." *Cozine*, 454 N.W.2d at 554.

[¶ 52.] SDCL 62–4–5.1 was amended effective July 1, 1994, which does not affect this

---

**11.** For a case reaching a similar conclusion, see *Towne v. Bates File Co.*, 497 So.2d 967, 968 (Fla.Dist.Ct.App.1986):

> A prior request to the Division [of Workers' Compensation] for evaluation of a claimant's need for rehabilitation is not an indispensable condition precedent to an award of rehabilitation.... [T]he claimant is not precluded from obtaining services independent of the employer and the Division, but when he does so he obtains those services at the risk he will not persuade the deputy commissioner that those particular services were necessary.

(Citations and internal quotations omitted). *See also* Martin K. Eby Constr. Co., Inc. v. Industrial Comm'n, 710 P.2d 1164, 1166 (Colo.Ct.App. 1985) ("[When] a claimant has established that unauthorized medical treatment or vocational rehabilitation has reduced the degree of permanent partial disability from which the claimant would otherwise have suffered and that the expenses thus incurred are reasonably proportionate to the benefit received, the employer is liable for such unauthorized but reasonable expenses."); *Freeman v. Poulan/Weed Eater*, 630 So.2d 733, 740–41 (La.1994) (holding that claimant's independent pursuit of a meaningful rehabilitation program "should not entirely relieve the employer of its rehabilitation obligation under the statute").

dispute; however, under the new version, a claimant must produce a certificate of enrollment to even request rehabilitation benefits. *See* SDCL 62–4–5.1 (Supp.1996). This may be further evidence that it makes sense to enroll in order to begin the process. Any other conclusion would force a claimant to wait for decisions from the Department,[12] the circuit court, and this court. For Kurtenbach, this would mean that he could not have safely commenced his rehabilitation program until after this court's decision. This may mean the fall semester of 1997—as it stands now, he has completed all but a year and a half of his degree program.

[¶ 53.] Therefore, a petition to the Department *before* enrollment is not necessary to receive rehabilitation benefits, notwithstanding the statement to the contrary in *Chiolis*. We should reverse the circuit court's denial of benefits for the time period between a claimant's enrollment and petition to the Department, because that holding was based entirely on the circuit court's correct reading of *Chiolis*, which we should now modify. The Department's holding that this petition was timely filed was correct.

KONENKAMP, J., joins this special writing.

## ATTACHMENT
## AVERAGE YEARLY SALARY OFFERS

### Bachelor's Degree Candidates

### (Data Combined for Men and Women)

| By Curriculum For All Types of Employers | Number of Offers January 1995 | Average $ Offer | | Percent Change in $ Offers from September 1994 | Percentiles | | |
|---|---|---|---|---|---|---|---|
| | | January 1995 | September 1994 | | 90th | 50th | 10th |
| **\* \* \* \*** | | | | | | | |
| Metallurgical Engineering | 21 | $35,000 | $33,429 | 4.7 | $38,100 | $37,000 | $30,000 |
| **\* \* \* \*** | | | | | | | |

12. The Department's findings of fact and conclusions of law were not filed until August 1995, nearly two years after Kurtenbach petitioned for a hearing.

EXHIB
F.D. ABF

ATTACHMENT

## SCOPE AND NATURE OF THE SURVEY

The CPC *Salary Survey* compiles reports from 365 career planning and placement offices of colleges and universities across the United States. They consist of starting salary offers made to new graduates by employing organizations in business, industry, government, and by non- profit and educational institutions. The figures reported are for base salaries only and do not include bonuses, fringe benefits, or overtime rates. Confidentiality is maintained for the individual, the college, and the employer.

The number of offers reported in each report is cumulative from the previous September. The offers reported in the *Survey* are a representative sample of actual job offers made to new college graduates during the recruiting year and do not imply all job offers made to all college graduates.

The *Survey* reports offers, not acceptances. It does not distinguish between single and multiple offers to individual students and, consequently, offers in the study cannot be equated with actual hires. Also, inasmuch as the ratio of offers to hires is partially a function of the economic climate, year-to-year ratio comparisons based on *Survey* data would be invalid. In those categories where offers are relatively few, the data should be regarded only as indicative.

The *Survey* is available only to members of the College Placement Council and to *Salary Survey* subscribers, and is intended for their professional use.

CPC Salary Survey (ISSN 0196-1004) Volume 34, Issue 1 is published 4 times a year in January, March, July, and September by College Placement Council, 62 Highland Ave., Bethlehem, PA 18017-9085. Second-class postage paid at Bethlehem, PA, permit #010666. POSTMASTER: send address changes to CPC Salary Survey, 62 Highland Ave., Bethlehem, PA 18017-9085. Subscription price is $220. CPC members receive one free subscription as part of membership.

Copyright 1995 by The College Placement Council, Inc.
No part of this publication may be used, adapted, or reproduced in any manner without written permission.